949 F.2d 984
 21 Fed.R.Serv.3d 1246
 STATE OF SOUTH DAKOTA in its own behalf, and as parens
patriae, Appellee,
v.
Gregg BOURLAND, personally and as Chairman of the Cheyenne
River Sioux Tribe and Dennis Rousseau, personally
and as Director of Cheyenne River Sioux
Tribe Game, Fish and Parks,
Appellants.
STATE OF SOUTH DAKOTA in its own behalf, and as parens
patriae, Appellant,
v.
Gregg BOURLAND, personally and as Chairman of the Cheyenne
River Sioux Tribe and Dennis Rousseau, personally
and as Director of Cheyenne River Sioux
Tribe Game, Fish and Parks, Appellees.
 Nos. 90-5486, 90-5515.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 15, 1991.
Decided Nov. 21, 1991.
 
 Scott B. McElroy, Boulder, Colo., argued (Bruce R. Greene, Boulder, Colo., and Steven C. Emery, Eagle Butte, S.D., on brief), for appellants.
 David C. Shilton, Dept. of Justice, Washington, D.C., argued (Richard B. Stewart, Edward J. Shawaker, William A. White and Steven K. Linscheid, on brief), for amicus curiae.
 John P. Guhin, Pierre, S.D., argued (Mark Smith, on brief), for appellee.
 Before BOWMAN, Circuit Judge, HEANEY and BRIGHT, Senior Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 This is an appeal from the decision of the District Court permanently enjoining the tribal defendants from regulating the hunting and fishing activities of nonmembers of the Cheyenne River Sioux Tribe ("Tribe") on certain lands within the Cheyenne River Reservation. We affirm in part, reverse in part, and remand in part.[1]
 
 I.
 
 2
 The Great Sioux Reservation was established by the Treaty with the Sioux Indians, Apr. 29, 1868, 15 Stat. 635, 636 ("Fort Laramie Treaty"). It comprised virtually all of what is now South Dakota west of the Missouri River, as well as part of what is now North Dakota. The Treaty explicitly recognized a number of tribal powers, including the exclusive right to use reservation lands. Id. at 636. In 1889, pursuant to the Act of March 2, 1889, ch. 405, 25 Stat. 888, the Great Sioux Reservation was divided into six separate reservations, one of which was the Cheyenne River Indian Reservation ("Reservation"). The Reservation lies in north-central South Dakota, with the Missouri River serving as its eastern border.
 
 
 3
 The Great Sioux Reservation was established at a time when the policy of the United States government was to enter into treaties with Indian tribes, establishing areas of sovereignty where tribes were allowed to govern themselves and to exercise control over "matters affecting tribal self-government." Felix S. Cohen, Handbook of Federal Indian Law 70 (Rennard Strickland, et al., eds., Michie 1982) (1942) ("Handbook ").[2] Land designated for the Reservation was held in trust by the United States for the benefit of the Tribe. In the late 1800s and early 1900s, however, the United States altered its policy regarding aboriginal tribes. The goal of the government became geared less towards self-sufficiency and self-rule for Indians; assimilation of Indians into the general population was the explicit goal. This was achieved by allowing non-Indians to acquire reservation land previously held in trust for Indians. "[A]n avowed purpose of the allotment policy was the ultimate destruction of tribal government." Montana v. United States, 450 U.S. 544, 559 n. 9, 101 S.Ct. 1245, 1255 n. 9, 67 L.Ed.2d 493 (1981). The policy was carried out by, inter alia, the General Allotment Act of 1887 ("Dawes Act"), 24 Stat. 388 and the Act of May 29, 1908, ch. 218, 35 Stat. 460, the latter of which allowed Reservation "surplus" lands to be sold to nonmembers.[3] This policy of assimilation led to a vast reduction in the amount of reservation land held in trust by the United States for tribes or individual Indians.[4] On the Cheyenne River Reservation, for example, land held in trust for Indians amounts to slightly less than half of the Reservation's total acreage.[5]
 
 
 4
 Recognizing that the assimilation policy was not working as intended, the United States changed course in the 1930s to encourage tribal self-determination. In 1934 Congress passed the Indian Reorganization Act, codified as amended at 25 U.S.C. § 461 et seq. (1988) ("IRA"), which allowed officially-recognized tribes to form their own constitutions and governments.[6] Pursuant to the IRA, the Cheyenne River Sioux Tribe enacted a tribal constitution and passed by-laws regulating hunting and fishing on the Reservation. South Dakota v. Ducheneaux, Civ. No. 88-3049, Mem.Op. at 9-10 (D.S.D. August 21, 1990) ("August Memorandum Opinion"), reprinted in Appellants' Addendum at 9-10. Congress later passed the Act of Aug. 15, 1953, Pub.L. No. 280, 67 Stat. 588 (codified in part at 18 U.S.C. § 1162 (1988) and 28 U.S.C. § 1360 (1988)) ("Public Law 280"), which was designed in part to transfer to certain state governments the power to regulate certain enumerated activities on Indian reservations. Included in Public Law 280 was a proviso recognizing that the law "shall [not] deprive any ... Indian tribe ... of any right ... afforded under Federal treaty ... with respect to hunting, trapping, or fishing or the control, licensing or regulation thereof." 18 U.S.C. § 1162(b) (1988).[7]
 
 
 5
 In 1944, Congress passed the Flood Control Act, ch. 665, 58 Stat. 887 (1944) ("Flood Control Act"). This statute was enacted to allow the government to enter into negotiations with landowners along various stretches of the Missouri River to purchase tracts of riverfront land. The land was needed so that the Army Corps of Engineers could construct a series of dams along the River to prevent downstream flooding, to help with irrigation, and for other purposes. Much of the land sought by the Corps was owned by or for Indians or Indian tribes. In 1950, Congress passed Pub.L. No. 870, 64 Stat. 1093 (1950) ("Public Law 870"), authorizing the Army and the Department of Interior to negotiate a contract with the Cheyenne River Tribe and the Standing Rock Sioux Tribe for land needed for the Oahe Dam and Reservoir. In the early 1950s, Congress authorized the purchase of land from six tribes in South Dakota pursuant to the Flood Control Act.[8] By the Act of Sept. 3, 1954, Pub.L. No. 776, 68 Stat. 1191 ("Cheyenne River Act"), Congress appropriated $10,644,014 for payment to the Tribe in exchange for rights to approximately 105,000 acres[9] of tribal and trust land abutting (and apparently partially underlying) the Missouri River.[10] Included in this appropriation were monies for the loss of grazing revenue, loss of wildlife, and relocation costs. The Act, however, did not eliminate all tribal interests in the taken land. It explicitly noted that the Tribe and its members retained the right to hunt and fish on the land, and the right to lease the unflooded portion of the taken land. It also granted to the Tribe leasing rights to the taken area that previously had been non-Indian fee land. Joint Appendix, vol. II at 433-39.
 
 
 6
 For a period of time, the Tribe and the State of South Dakota were able to negotiate successfully an agreement resolving the issue of regulatory authority over hunting and fishing activities on Reservation lands. In 1988, however, after negotiations for the upcoming deer hunting season broke off, the Tribe announced that it would not honor state permits issued to people wishing to hunt on the Reservation. The State filed suit, asking the District Court to enjoin the tribal defendants from regulating the hunting and fishing activities of non-Indians on non-Indian fee land and the taken land in the Reservation. The court determined that the Tribe possessed no regulatory authority over nonmembers hunting and fishing on nonmember fee land and the taken area, and permanently enjoined the defendants from attempting to exercise such authority.
 
 
 7
 On appeal, the tribal defendants raise four issues: 1) the District Court erred in not requiring the State to join the Tribe as an indispensable party; 2) the District Court erred in not requiring the State to join the United States as an indispensable party; 3) the District Court erred in ruling that the tribal defendants have no regulatory authority over nonmember Indians (as distinct from non-Indians) on the land in question because the issue was neither pled nor tried; and 4) the District Court erred in determining that the defendants possess no authority to regulate non-Indian hunting and fishing on the taken area.[11] On cross-appeal, the State urges us either to declare as dicta language in the District Court opinion concerning the reach of the Lacey Act, codified in relevant part at 16 U.S.C. §§ 3371-78 (1988), and the federal trespass statute, 18 U.S.C. § 1165 (1988), or to reverse the District Court with respect to its interpretation of these statutes.
 
 II.
 
 8
 The tribal defendants claim that the District Court erred in proceeding with the case because the United States and the Tribe are indispensable parties, and that the case should not have proceeded in their absence. We review trial court determinations of indispensability under Fed.R.Civ.P. 19 for abuse of discretion. See Reserve Mining Co. v. Environmental Protection Agency, 514 F.2d 492, 534 (8th Cir.1975), modified on other grounds, Reserve Mining Co. v. Lord, 529 F.2d 181 (8th Cir.1976); accord Sindia Expedition v. Wrecked and Abandoned Vessel, 895 F.2d 116, 121 (3rd Cir.1990); Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 635 (1st Cir.1989); McVay v. Western Plains Serv. Corp., 823 F.2d 1395, 1401 (10th Cir.1987); Northern Alaska Envtl. Ctr. v. Hodel, 803 F.2d 466, 468 (9th Cir.1986); Pulitzer-Polster v. Pulitzer, 784 F.2d 1305, 1309 (5th Cir.1986); but see Local 670 v. International Union, United Rubber, Cork, Linoleum and Plastic Workers, 822 F.2d 613, 619 (6th Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988) (holding that determination of indispensability is a legal conclusion subject to de novo review).
 
 
 9
 We hold that the District Court did not abuse its discretion in proceeding with the case without joining the United States as a party. The District Court issued its ruling on the assumption that the United States was an indispensable party pursuant to Rule 19(a) with respect to the taken area. It also assumed that the United States had not waived its sovereign immunity. The District Court, using the factors enumerated in Rule 19(b) and in Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109-12, 88 S.Ct. 733, 737-39, 19 L.Ed.2d 936 (1968), to evaluate whether the action should proceed, decided in "equity and good conscience ... that the present parties should be allowed to proceed with this case." South Dakota v. Ducheneaux, Civ. No. 88-3049, Mem.Op. at 8, (D.S.D. July 3, 1989) ("July Memorandum Opinion"), reprinted in Appellants' Addendum at 58, 65. We cannot say that this finding was an abuse of discretion.[12]
 
 
 10
 With respect to the Tribe, the District Court found that the Tribe was not an indispensable party. This finding was not an abuse of discretion. Although the State attacks the validity of the Tribe's regulations, its claim is premised on the argument that "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign.... [T]he power has been conferred in form but the grant is lacking in substance because of its ... invalidity." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690, 69 S.Ct. 1457, 1462, 93 L.Ed. 1628 (1949). The State's suit seeking injunctive relief against the named tribal officials therefore is proper, id. at 689-90, 69 S.Ct. at 1461-62, and the Tribe is not an indispensable party.
 
 III.
 
 11
 The tribal defendants also claim that the District Court erred in determining that they have no jurisdiction over the hunting and fishing activities of nonmember Indians on nonmember fee lands or the taken area. We agree. The issue of tribal jurisdiction over nonmember Indians was neither pled nor tried; the complaint was limited to the question of jurisdiction over non-Indians. See Second Amended Complaint, reprinted in Joint Appendix, vol. I at 53. Issues not before the trial court should not be addressed sua sponte. Contrary to the State's assertion, the Supreme Court's decision in Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), does not resolve the issue of tribal civil jurisdiction over the hunting and fishing activity of nonmember Indians. Duro dealt only with tribal criminal jurisdiction over nonmember Indians. Id. 110 S.Ct. at 2056. Because tribal criminal jurisdiction and tribal civil jurisdiction have been treated differently by the courts, see Handbook at 245-46 (discussing cases), Duro cannot be said to have decided the issue of tribal civil jurisdiction. As this issue was not properly before the District Court, the portion of the District Court's opinion dealing with the defendants's regulatory authority over nonmember Indians is vacated.
 
 IV.
 
 12
 In considering the State's claim that the tribal defendants have no authority to regulate non-Indian hunting and fishing on the taken land, we are required to pick up where we left off in Lower Brule Sioux Tribe v. South Dakota, 711 F.2d 809 (8th Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984): we now must determine "whether the Tribe ... has jurisdiction to regulate hunting and fishing by nonmembers of the Tribe within the ... tak[en] areas." Id. at 825 n. 23.[13] Although Lower Brule left this question open, it decided other issues important to our inquiry. First, it seems clear from Lower Brule that the Cheyenne River Act did not disestablish the boundaries of the Reservation. Cf. id. at 821 (holding that two sister taking acts, with language similar to that used in the Cheyenne River Act, did not disestablish reservation boundaries). Lower Brule also held that the taking acts did not abrogate the hunting and fishing rights guaranteed to the Sioux tribes in the Fort Laramie Treaty. Id. at 826-27. Thus the Sioux retain their right to hunt and fish on their reservation free from state regulation. Id. at 827.
 
 
 13
 From that apparent simplicity, however, regulatory complexity lingers. On the one hand, the right of the Tribe to regulate non-Indian hunting and fishing on fee land acquired by non-Indians pursuant to the allotment policy has been abrogated by Congress. Montana, 450 U.S. at 559, 101 S.Ct. at 1255. On the other hand, the Tribe retains regulatory authority over non-Indian hunting and fishing on land held in trust for the Tribe by the United States. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 330, 103 S.Ct. 2378, 2384, 76 L.Ed.2d 611 (1983); Montana, 450 U.S. at 557, 101 S.Ct. at 1254. The taken area, however, is neither non-Indian-owned fee land nor trust land. In determining the scope of the Tribe's regulatory power over this land, we must use the approach followed by the Supreme Court and by our Court in Lower Brule: tribal rights are abrogated only if Congress "has clearly expressed its intent to do so," keeping in mind that "doubtful expressions of intent must be resolved in favor of the Indians." Lower Brule, 711 F.2d at 827; see also Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n., 443 U.S. 658, 690, 99 S.Ct. 3055, 3077, 61 L.Ed.2d 823 (1979) ("[a]bsent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights"), modified on other grounds sub nom., Washington v. United States, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979); Menominee Tribe of Indians v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968) (" '[T]he intention to abrogate or modify a treaty is not to be lightly imputed to the Congress' ") (quoting Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox Co., 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934)); Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987) (" '[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent' ") (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60, 98 S.Ct. 1670, 1678, 56 L.Ed.2d 106 (1978)); County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985) ("[I]t is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (citations omitted)).
 
 
 14
 Using this approach, we must identify the rights originally granted to the Tribe and track subsequent alterations to, and limitations of, those rights. The Fort Laramie Treaty granted the Tribe an exclusive right to control hunting and fishing on the Reservation. Fort Laramie Treaty, 15 Stat. 636; Lower Brule, 711 F.2d at 815; see also United States v. Dion, 476 U.S. 734, 738, 106 S.Ct. 2216, 2219, 90 L.Ed.2d 767 (1986) ("As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress.... These rights need not be expressly mentioned in the treaty.") (citation omitted) (unanimous opinion). Cf. Montana, 450 U.S. at 558-59, 101 S.Ct. at 1254-55 (Fort Laramie Treaty conferred the authority to regulate hunting and fishing on the reservation). Complete jurisdiction over hunting and fishing on the Reservation was not to last, however, as land on the Reservation fell into the hands of non-Indians pursuant to the allotment policy. As noted in Montana and Brendale v. Confederated Tribes & Bands of Yakima Indian Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), non-Indian hunting and fishing on non-Indian reservation fee land is not necessarily subject to tribal regulation: "[A]ny regulatory power the Tribe might have under the treaty 'cannot apply to lands held in fee by non-Indians.' " Brendale, 492 U.S. at 425, 109 S.Ct. at 3005 (quoting Montana, 450 U.S. at 559, 101 S.Ct. at 1255) (White, J., plurality opinion).[14]
 
 
 15
 The Montana and Brendale decisions are based on an analysis that found an unmistakable Congressional intent to abrogate tribal regulatory authority over non-Indian hunting and fishing on non-Indian fee land:
 
 
 16
 We analyzed the effect of the Allotment Act on an Indian tribe's treaty rights to regulate activities of nonmembers on fee land in Montana ... [W]e concluded that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." [Montana, 450 U.S. at 561, 101 S.Ct. at 1256]. In Montana, as in the present cases, the lands at issue had been alienated under the Allotment Act, and the Court concluded that "[i]t defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government." 450 U.S. at 560, n. 9, 101 S.Ct. at 1256, n. 9.
 
 
 17
 Brendale, 492 U.S. at 422-23, 109 S.Ct. at 3004 (citations omitted) (White, J., plurality opinion). It is because of the intent to destroy tribal government underlying the Allotment Acts that the Montana and Brendale Courts found that tribal regulatory authority over non-Indian hunting and fishing on non-Indian fee land had been abrogated. Accordingly, in order for us to determine the Tribe's jurisdiction over the taken land, we must examine the policy behind the Cheyenne River Act to see if Congress clearly expressed an intent to divest the Tribe of regulatory authority over non-Indian hunting and fishing activity on the taken area. See Dion, 476 U.S. at 738-39, 106 S.Ct. at 2219-20.
 
 
 18
 The State contends that Section Four of the Flood Control Act, codified at 16 U.S.C. § 460d (1988) contains language that evinces a clear intent to abrogate the Tribe's regulatory rights with respect to hunting and fishing on the taken land. Section Four reads in relevant part: "No use of [the reservoirs created pursuant to the Act] shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated." Id. This language is not a sufficiently clear expression of an intention to divest tribal regulatory authority on the taken area. Lower Brule, 711 F.2d at 826-27.
 
 
 19
 In Lower Brule, we noted that this language in Section Four "cannot be viewed in isolation.... The 1944 act envisions a scheme of federal--not state--regulation over flood control projects." Id. at 825 n. 23. Section Four merely insures that state fish and game authority, where already in effect, would not be preempted by the federal government. It means "only that the Secretary of the Army cannot promulgate regulations regarding recreational activities by the 'general public' within 'public park and recreation facilities' which contravene state conservation laws." Id. It cannot be read to evince a "transfer" of authority from the Tribe to the State, especially in light of the fact that tribal rights are never mentioned in Section Four.[15] If we were to read Section Four as the State urges, the State, and not the Tribe, would have regulatory authority over Indians hunting and fishing on the taken area. This result, of course, expressly was rejected in Lower Brule. As we recognized, "there is simply no indication in the legislative history that Congress even considered Indian rights when it adopted section 4." Lower Brule, 711 F.2d at 825 n. 23. Thus, Section Four falls well short of the required "clear[ ] express[ion] [of Congressional] intent." Id. at 827.[16]
 
 
 20
 The State also points to Public Law 870, which authorized the Corps of Engineers and the Interior Department to negotiate a contract with the Tribe for the land needed to construct the Oahe Dam and Reservoir. The bill introduced in the Senate leading up to the passage of Public Law 870 contained a section stating that the contract shall "provide for the preservation of treaty rights of the tribe ... in regard to fishing, hunting, and trapping insofar as is practicable under the physical conditions existing when the Oahe project is completed." S. 1488, 81st Cong., 1st Sess., § 2(e) (1949), reprinted in Joint Appendix, vol. III at 561. The House version of the bill contained virtually identical language. H.R. 5372, 81st Cong., 1st Sess. § 2(d) (1949), reprinted in Joint Appendix, vol. III at 552.
 
 
 21
 In its final version, however, Public Law 870 contained no such express language. Instead, it simply provided for "just compensation for lands and improvements and interests therein." 64 Stat. 1094. The State contends that this history "show[s] that the Congress considered and rejected the possibility of retaining in the Tribe its hunting and fishing treaty rights." Appellee's Brief at 21. We disagree, as such analysis turns Washington and Menominee on their heads. Proper analysis of Indian legislation finds the elimination of treaty rights only when such action is clearly expressed; statutes are not examined for an affirmative reaffirmation of previously-granted treaty rights. We find no clear expression in Public Law 870 of an intent to abrogate the Tribe's regulatory jurisdiction over non-Indians hunting and fishing in the taken area.
 
 
 22
 The State next turns to the Cheyenne River Act for evidence of an intent to abrogate the Tribe's regulatory powers on the taken land. The purpose of the Cheyenne River Act, as stated in its preamble, was to "provide for the acquisition of lands by the United States required for the reservoir created by the construction of the Oahe Dam ... and for rehabilitation of the Indians of the Cheyenne River Sioux Reservation, South Dakota, and for other purposes." 68 Stat. 1191. The dam was built for irrigation and flood control purposes, not for purposes of settling non-Indians on the taken lands. Lower Brule, 711 F.2d at 820; see also ETSI Pipeline Project v. Missouri, 484 U.S. 495, 502, 108 S.Ct. 805, 810, 98 L.Ed.2d 898 (1988) (stating that the purpose of the Flood Control Act was to erect the Oahe Dam).
 
 
 23
 The Cheyenne River Act "convey[ed] to the United States all tribal, allotted, assigned, and inherited lands or interests within said Cheyenne River Reservation belonging to the Indians of said reservation [needed for the Oahe Dam and Reservoir], ... subject, however, to the conditions of this agreement hereinafter set forth...." 68 Stat. 1191. Among the conditions placed on the conveyance were that "all mineral rights ... within the taking area" would be reserved to the Tribe or its members, 68 Stat. 1192; that "[t]he members of the said Indian Tribe shall have the right without charge to cut and remove all timber and salvage any portion" of the improvements on the taken area, id.; that the members of the Tribe residing within the taken area "shall have the right without charge to remain on and use the lands" until the gates of the Dam were closed, id.; that the Tribe and its members "shall have the right to graze stock" on the unflooded portion of the taken area, including land previously held in fee by non-Indians, 68 Stat. 1193; and that the "Tribal Council and the members of said Indian tribe shall have, without cost, the right of free access to the shoreline of the reservoir including the right to hunt and fish" in the taken area, including the reservoir, "subject, however, to regulations governing the corresponding use by other citizens of the United States." Id.
 
 
 24
 The conveyance of tribal land to the United States also was conditioned upon the payment for costs of relocating "Indian cemeteries, tribal monuments and shrines within the taking area," id. at 1191, and for the costs of relocating schools, hospitals, and other facilities, id. at 1192; and upon payment for
 
 
 25
 the purpose of complete rehabilitation for all members of said Tribe who are residents of the [Reservation], whether or not residing within the taking area of the Oahe Project, and for relocating and reestablishing members of said Tribe who reside [in the taken area] to the extent that the economic, social, religious, and community life of all said Indians shall be restored to a condition not less advantageous to said Indians than the condition that the said Indians now are in.
 
 
 26
 68 Stat. 1192.
 
 
 27
 It is obvious, then, that the Cheyenne River Act was not a simple conveyance of land and all attendant interests in the land. Significant portions of the "bundle of property rights" explicitly were reserved to the Tribe. The purpose of the Act, unlike that of the Allotment Act at issue in Montana, was not the destruction of tribal self-government, but was only to acquire the property rights necessary to construct and operate the Oahe Dam and Reservoir.[17] The tribe retained significant rights in the taken land, including the leasing rights to grazing land previously held in fee by non-Indians. Joint Appendix, vol. II at 433-39. We recognized in Lower Brule that "[c]ontinued Indian control of [the taken area] is not inconsistent with the federal government's purpose in acquiring the property, as might be the case if, for example, the reservation was acquired to permit settlement by non-Indians." Lower Brule, 711 F.2d at 818 n. 10.
 
 
 28
 Examination of the legislative history of the Act reveals no clear intent to eliminate tribal regulatory rights. In a letter appended to the House Report on the Act, the Department of the Army reported that the Corps of Engineers opposed the section of the Act recognizing that the Tribe retained its hunting and fishing rights on the taken area, H.R.Rep. No. 2484, 83rd Cong., 2d Sess. at 11 (1954), but Congress declined to remove the language. Neither the House Committee Report, H.R.Rep. 2484 at 1, nor the Senate Committee Report, S.Rep. No. 2489, 83rd Cong., 2d Sess. 1 (1954), both of which accompanied the Act, make any mention of the jurisdictional issue concerning regulatory authority over hunting and fishing on the taken lands. Nor does the letter from the Assistant Secretary of the Interior Department, attached to both Committee Reports, discuss the issue. As the District Court noted in its opinion, "[c]ircumstances surrounding the Cheyenne River Act indicate that the jurisdiction issue simply was not considered." August Memorandum Opinion at 45, reprinted in Appellant's Addendum at 45.
 
 
 29
 We agree with the District Court's conclusion that Congress did not consider the issue of jurisdiction to regulate hunting and fishing when enacting the Cheyenne River Act. The significance we attach to this lack of consideration, however, is markedly different from the significance the District Court attached to it. The District Court assumed that the taken land could not be distinguished from fee land alienated pursuant to the Allotment Acts as described in Montana. It then used the absence of an intent to deal with the jurisdictional issue as a basis for concluding that Congress abrogated tribal regulatory rights via the Act and declined affirmatively to grant such rights back to the Tribe. In so proceeding, the District Court erred. The correct analysis, the one counselled by the Supreme Court, is to look to the purpose of the Act and to decide a jurisdictional issue left unresolved by the language of the Act in light of that purpose. As the purpose of the Act was simply to enable the United States to acquire the land needed for the construction of the Oahe Dam and Reservoir, and to do so with as little disruption as possible to the life of the Tribe, the Tribe must be given the benefit of the doubt. We do not have here the essential "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." Dion, 476 U.S. at 740, 106 S.Ct. at 2220. Thus, applying Dion, 476 U.S. at 738-40, 106 S.Ct. at 2219-21, Washington, 443 U.S. at 690, 99 S.Ct. at 3076, and Menominee, 391 U.S. at 413, 88 S.Ct. at 1711, we conclude that the Tribe's treaty-based right to regulate non-Indian hunting and fishing activities on the portion of the taken area conveyed pursuant to the Cheyenne River Act has not been abrogated.[18] Cf. Iowa Mut. Ins., 480 U.S. at 18, 107 S.Ct. at 977-78 (" 'Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact.' ") (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 n. 14, 102 S.Ct. 894, 907 n. 14, 71 L.Ed.2d 21 (1982)). The order of the District Court permanently enjoining the defendants from enforcing tribal hunting and fishing regulations on such land therefore is reversed.
 
 
 30
 This is not to say, however, that the Tribe is free entirely to exclude non-Indians from hunting and fishing on the portion of the taken land over which it has control. The Tribe's "right to hunt and fish in and on the [Oahe Dam] shoreline and reservoir [is] subject, however, to regulations governing the corresponding use by other citizens of the United States." Cheyenne River Act, 68 Stat. 1193. Further, Section Four of the Flood Control Act requires that the "water areas of all such projects shall be open to public use generally." 16 U.S.C. § 460d. It appears, then, that the Tribe may not enact a flat ban on non-Indian hunting or fishing on the portion of the taken area subject to tribal jurisdiction, nor may it impose unreasonably discriminatory limits on such activities. The scope of the Tribe's regulations are not presently at issue, however, and so we decline to address this question further.
 
 
 31
 With respect to the portion of the taken area that is comprised of land other than that conveyed to the United States pursuant to the Cheyenne River Act, we remand the case to the District Court. According to the State, the taken area includes approximately 18,000 acres of land which previously had been held by non-Indians. Appellee's Brief at 1. This land cannot be grouped with the taken land previously held by or for Indians. As we have noted, neither the Flood Control Act, Public Law 870, nor the Cheyenne River Act addresses the issue of tribal jurisdiction within the taken area. With respect to the 18,000 acres of taken land previously held in fee by non-Indians, this cuts against the Tribe. Congress has not affirmatively granted to the Tribe regulatory authority over such land. Since Montana held that tribes have been divested of their regulatory authority over non-Indians hunting and fishing on land held in fee by non-Indians pursuant to an allotment act, the lack of a grant of such power requires us to conclude that the Tribe does not possess such authority, unless one of the Montana exceptions is met.[19] Montana, 450 U.S. at 559, 565-66, 101 S.Ct. at 1255, 1258.
 
 
 32
 The District Court found that the taken area was not a "pristine," or closed, area, as that term is used in Justice Stevens' plurality opinion in Brendale, 492 U.S. at 439, 445, 109 S.Ct. at 3012, 3015. August Memorandum Opinion at 17, reprinted in Appellants' Addendum at 17. Because the 18,000 acres within the taken area are in an "open" area, the analysis used by Justice White in his plurality opinion in Brendale should be applied to this acreage. According to Justice White's opinion, the 18,000 acres should be analyzed under the Montana standard. Brendale, 492 U.S. at 421-33, 109 S.Ct. at 3003-09. The District Court performed such an analysis of the taken area in whole, and found that neither of the exceptions to the general rule laid out in Montana applied. However, in light of our holding that the tribal defendants possess regulatory authority over the rest of the taken area, it would be appropriate for the District Court to again undertake a Montana analysis, limiting its inquiry to the 18,000 acres in question.[20]
 
 
 33
 We recognize that the jurisdictional map resulting from our opinion may be a confusing "checkerboard," with neighboring tracts of land subject to different regulations.[21] In fact, however, a "checkerboard" pattern of jurisdiction already exists on the Reservation, as non-Indians hunting on non-Indian fee land are subject to a different regulatory scheme from the one they are subject to when they hunt on (possibly neighboring) tribal land. The Supreme Court in Montana and Brendale authorized such "checkerboard" jurisdiction by mandating that neighboring tracts of land be subject to different regulatory authorities on the basis of the type of ownership, or the nature, of the land. This mandated "checkerboarding" has been in effect now for at least eleven years; if it is a problem that needs fixing, the remedy lies with Congress, not the courts.[22]
 
 
 34
 This "checkerboarding" jurisdictional problem does give us, however, a reason to take the time to urge upon the parties the benefit of a negotiated settlement. As long as the issue of tribal jurisdiction is avoided by Congress, jurisdictional problems like those encountered in this case are sure to continue to be presented;[23] litigated results are likely to leave all parties less than satisfied. In this case, each party could benefit from a negotiated settlement of the jurisdictional issue. As was noted at oral argument, this case "cries out" for a settlement. We are hopeful some reasonable accommodation satisfactory to both parties can be reached.
 
 V.
 
 35
 On cross-appeal, the State takes issue with language in the District Court opinion concerning both the Lacey Act, 16 U.S.C. §§ 3371-78, and the federal trespass statute, 18 U.S.C. § 1165. As the District Court itself noted, "[t]he scope of the federal government's prosecutorial powers under the Lacey Act is unrelated to the question whether the Tribe can exclude nonmembers from the taken area or fee lands." August Memorandum Opinion at 51, reprinted in Appellants' Addendum at 51 (emphasis in original). The court's discussion concerning the scope of the Lacey Act therefore is dicta. With respect to the discussion in the District Court's opinion concerning the federal trespass statute, the District Court again made passing reference to a source of federal, not tribal jurisdiction. August Memorandum Opinion at 46, reprinted in Appellants' Addendum at 46. Such language also is dicta.
 
 VI.
 
 36
 To sum up, we affirm the District Court's decision not to join either the Tribe or the United States as an indispensable party. We vacate the order of the District Court to the extent that it deals with tribal regulatory authority over nonmember Indians. We reverse the order of the District Court permanently enjoining the tribal defendants from enforcing tribal hunting and fishing regulations on the portion of the taken land conveyed pursuant to the Cheyenne River Act. Finally, with respect to the portion of the taken area comprising land other than that conveyed to the United States pursuant to the Cheyenne River Act, we remand the case to the District Court for proceedings consistent with this opinion.
 
 
 
 [1]
 For purposes of this opinion, even though a cross-appeal was filed, the tribal defendants will be referred to, where appropriate, as "appellants" and the State as "appellee."
 
 
 [2]
 This policy, however, was not constant during the treaty-making period of the 1800s. See Felix S. Cohen, Handbook of Federal Indian Law 62-70 (Rennard Strickland, et al., eds., Michie 1982) (1942) ("Handbook ")
 
 
 [3]
 The Act of March 2, 1889, which created the Cheyenne River Indian Reservation and five other reservations from what had been the Great Sioux Reservation, also authorized presidentially-appointed agents to allot parcels of Reservation land to individual Indians, who in turn, after a period of years, were allowed to alienate freely their parcels of land to anyone, including nonmembers and non-Indians. Act of Mar. 2, 1889, ch. 405, §§ 10, 11, 25 Stat. 888, 891
 
 
 [4]
 The Acts of 1889 and 1908, while enabling non-Indians to acquire title of Reservation land, did not diminish the Reservation. See Solem v. Bartlett, 465 U.S. 463, 481, 104 S.Ct. 1161, 1171, 79 L.Ed.2d 443 (1984)
 
 
 [5]
 According to the District Court, trust land held for individual Indians or the Tribe amounts to 1,395,729 acres, or 49.8% of the Reservation's 2,806,914 total acres. South Dakota v. Ducheneaux, Civ. No. 88-3049, Mem. Op. at 7, 9 (D.S.D. August 21, 1990) ("August Memorandum Opinion"), reprinted in Appellant's Addendum at 7, 9. The District Court also found that "about 1,395,729 acres, or 46.5 percent" of the Reservation are held in fee simple by members and nonmembers. Id. at 9. The remaining 3.7% of the Reservation's acreage, the subject of this appeal, is the land taken by the United States for the Oahe Dam and Reservoir Project. Id. While the numbers cited by the court are not entirely free from minor error (46.5% of 2,806,914 is 1,305,215), this slight discrepancy is not relevant to our decision
 
 
 [6]
 The policy of encouraging Indian self-determination has been reaffirmed in the Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 et seq. (1988), the Indian Financing Act of 1974, 25 U.S.C. § 1451 et seq. (1988), the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450, 450a-450n, 458, 458a-458e (1988), and the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et seq. (1988)
 
 
 [7]
 In the 1940s and 1950s, the federal government briefly turned to a "termination policy" in Indian affairs. Important to our case is that while this policy's effects were broad, it explicitly was applied to only a few tribes; moreover, the policy's goal was aimed more at terminating the federal government's role in Indian affairs than at terminating tribal sovereignty. See Handbook at 152-80
 
 
 [8]
 For a discussion regarding one of these transactions, see Lower Brule Sioux Tribe v. South Dakota, 711 F.2d 809, 813-14 (8th Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984)
 
 
 [9]
 It is unclear whether the 105,000 acres referred to as the taken land purchased pursuant to the Cheyenne River Act includes the approximately 18,000 acres of taken land that was previously held in fee by non-Indians. Appellee's Brief at 1. As mentioned in n. 5, supra, minor discrepancies of this sort are not legally significant to our opinion in this case
 
 
 [10]
 This land so acquired by the United States, along with the non-Indian fee land acquired by the United States in conjunction with the Flood Control Act of 1944, ch. 665, 58 Stat. 887 ("Flood Control Act"), will be referred to as the "taken" land or area
 
 
 [11]
 The tribal defendants do not appeal the portion of the District Court's opinion holding that they do not have the authority to regulate non-Indian hunting and fishing on non-Indian fee land
 
 
 [12]
 It is doubtful whether the United States is an indispensable party to this action, as it appears complete relief can be accorded the parties involved and apparently there is no substantial risk that any of the parties will be subjected to "inconsistent obligations." Fed.R.Civ.P. 19(a). But we need not and do not decide that question
 
 
 [13]
 We are not asked to decide, and we do not address, the question of whether the State possesses regulatory authority in the taken area. The complaint filed by the State asked only for a determination of tribal authority within the taken area, not for a declaration of the State's authority
 
 
 [14]
 Montana noted two exceptions to this rule. See n. 20, infra
 
 
 [15]
 Indeed, the only mention of Indians in the Flood Control Act occurs in Section 9(c), which states that "irrigation of Indian trust and tribal lands, and repayment therefor, shall be in accordance with the laws relating to Indian lands." Flood Control Act, 58 Stat. 891. This reference in no way implicates tribal regulatory authority; at most, it can be viewed as support for the notion that the Flood Control Act meant to retain the status quo with respect to Indian rights
 
 
 [16]
 It bears repeating that the Flood Control Act was passed during a period when the federal government's "Indian policy" was to promote tribal autonomy and self-government, see supra at 987-988. This is in distinct contrast to the explicit policy in place during the time the Allotment Acts were enacted; namely, a policy of "destruction of tribal government." Montana v. United States, 450 U.S. 544, 560 n. 9, 101 S.Ct. 1245, 1256 n. 9, 67 L.Ed.2d 493 (1981). Considered in this context, the bid to view Section Four of the Flood Control Act as a clear expression of an intent to abrogate Tribal rights loses even more stature
 
 
 [17]
 The Corps of Engineers was authorized to negotiate a contract to "provide for conveyance to the United States of the title to all tribal, allotted, and inherited lands or interests therein belonging to the Indians of the tribe which are required by the United States for the Oahe Dam and Reservoir." H.R.Rep. No. 2484, 83rd Cong., 2d Sess., at 3 (1954) (emphasis added)
 
 
 [18]
 Our holding, recognizing tribal regulatory authority over non-Indians on land not held by or for Indians without first conducting a Montana analysis, is not unique. In New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 330, 103 S.Ct. 2378, 2384, 76 L.Ed.2d 611 (1983), a unanimous Supreme Court noted that New Mexico had conceded that the Tribe may regulate non-member hunting and fishing on the reservation. No mention was made, however, of a possible conflict with the Court's Montana decision concerning the land on the reservation not owned by or for Indians. Although such land was only a small part of the reservation (193.85 acres out of a total of 460,000 acres), Mescalero, 462 U.S. at 326, 103 S.Ct. at 2382, it is instructive that there was no dispute or discussion concerning jurisdiction over this land. In fact, the Court declined to allow the State even concurrent jurisdiction over this land. Id. at 344, 103 S.Ct. at 2392
 
 
 [19]
 Our order is based, of course, on the assumption that these 18,000 acres previously had been held in fee by non-Indians pursuant to an allotment act. If this is not the case, then the analysis of the jurisdictional issue concerning this land may be different
 
 
 [20]
 The exceptions noted in Montana that would allow tribes to exercise regulatory authority over non-Indian activity on land held in fee by non-Indians are: 1) the "activities of nonmembers who enter consensual relationships with the tribe or its members," Montana, 450 U.S. at 565, 101 S.Ct. at 1258; and 2) the "conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566, 101 S.Ct. at 1258. It is conceivable that the District Court may find that non-Indian hunting and fishing on the 18,000 acres within the taken land meets one of these exceptions, in light of our decision that the Tribe retains regulatory authority over the remainder of the taken land
 
 
 [21]
 The potential for jurisdictional confusion is heightened with respect to the submerged portion of the taken area
 
 
 [22]
 The problem, if there is one, is not the direct result of the Montana opinion. "Checkerboard" jurisdiction is the result of frequent changes of course by the federal government in its policies concerning the Indians and their land. Over the years, these policy changes have brought about contradictory and confusing results
 
 
 [23]
 See, i.e., n. 13, supra