## SOUTH DAKOTA *v.* BOURLAND, INDIVIDUALLY AND AS CHAIRMAN OF THE CHEYENNE RIVER SIOUX TRIBE, ET AL.

No. 91–2051.   Argued March 2, 1993—Decided June 14, 1993

*Mark Barnett,* Attorney General of South Dakota, argued the cause for petitioner. With him on the briefs was *John P. Guhin,* Deputy Attorney General.

*Brian Stuart Koukoutchos* argued the cause for respondents. With him on the brief were *Laurence H. Tribe, Mark C. Van Norman, Steven C. Emery,* and. *Timothy W. Joranko.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General O'Meara, Edwin S. Kneedler, Edward J. Shawaker, David C. Shilton,* and *Thomas L. Sansonetti.**

JUSTICE THOMAS delivered the opinion of the Court.

In this case we consider whether the Cheyenne River Sioux Tribe may regulate hunting and fishing by non-Indians on lands and overlying waters located within the Tribe's res-

---

*Briefs of *amici curiae* urging reversal were filed for the State of Montana et al. by *Marc Racicot,* Attorney General of Montana, and *Deanne L. Sandholm,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *James H. Evans* of Alabama, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Nicholas J. Spaeth* of North Dakota, *Paul Van Dam* of Utah, and *Kenneth O. Eikenberry* of Washington; for Corson County, South Dakota, et al. by *Kenn A. Pugh;* and for the International Association of Fish and Wildlife Agencies by *Paul A. Lenzini.*

*William R. Perry, Reid Peyton Chambers,* and *Charles A. Hobbs* filed a brief for the Standing Rock Sioux Tribe et al. as *amici curiae* urging affirmance.

ervation but acquired by the United States for the operation of the Oahe Dam and Reservoir.

I

In 1868, the Fort Laramie Treaty, 15 Stat. 635, established the Great Sioux Reservation, which comprised most of what is now western South Dakota and part of North Dakota. Article II of the treaty provided that the reservation was to be held for the "absolute and undisturbed use and occupation" of Sioux Tribes and that no non-Indians (except authorized government agents) would "ever be permitted to pass over, settle upon, or reside in" the Great Sioux Reservation. *Id.*, at 636. The Act of Mar. 2, 1889, ch. 405, 25 Stat. 888, removed a substantial amount of land from the reservation and divided the remaining territory into several reservations, including the Cheyenne River Reservation, which is located in north-central South Dakota. The 1889 Act preserved those rights of the Sioux under the Fort Laramie Treaty that were "not in conflict" with the newly enacted statute. § 19, 25 Stat. 896. The land designated for the Cheyenne River Reservation was held in trust by the United States for the benefit of the Tribe. 949 F. 2d 984, 987 (CA8 1991).

The 1889 Act also authorized the President to allot parcels of land within the reservation to individual Indians. § 8, 25 Stat. 890. Some of these allotted lands were subsequently acquired by persons not members of the Cheyenne River Sioux Tribe. Non-Indians also acquired fee title to some of the unallotted and "surplus" lands on the reservation pursuant to the Indian General Allotment Act of 1887, ch. 119, 24 Stat. 388, and the Act of May 29, 1908, ch. 218, 35 Stat. 460. The Indian General Allotment Act allowed surplus lands to be sold to non-Indians; the Act of 1908 authorized the Secretary of the Interior to open for non-Indian settlement more than 1.6 million acres previously held in trust by the United States. These enactments vastly reduced the amount of

reservation land held in trust by the United States for the Tribe and its members. Today trust lands comprise less than 50% of the reservation. App. 64.

After severe floods devastated the lower Missouri River basin in 1943 and 1944, Congress passed the Flood Control Act of 1944, ch. 665, 58 Stat. 887. This Act authorized the establishment of a comprehensive flood control plan along the Missouri River, which serves as the eastern border of the Cheyenne River Reservation. The Act also directed the Army Chief of Engineers to "construct, maintain, and operate public park and recreational facilities in reservoir areas," and provided that the "reservoirs shall be open to public use generally," subject to "such rules and regulations as the Secretary of War may deem necessary." § 4, 58 Stat. 889–890. Seven subsequent Acts of Congress authorized limited takings of Indian lands for hydroelectric and flood control dams on the Missouri River in both North and South Dakota. See *Lower Brule Sioux Tribe* v. *South Dakota*, 711 F. 2d 809, 813, n. 1 (CA8 1983), cert. denied, 464 U. S. 1042 (1984). One of the largest of these takings involved the Oahe Dam and Reservoir Project, for which Congress required the Cheyenne River Sioux Tribe to relinquish 104,420 acres of its trust lands, including roughly 2,000 acres of land underlying the Missouri River.[1] The Tribe's agreement to "convey to the United States all tribal, allotted, assigned, and inherited lands or interests" needed for the project is memorialized in the Cheyenne River Act of Sept. 3, 1954, 68 Stat. 1191.[2]

---

[1] Congress authorized the Departments of the Army and the Interior to negotiate contracts with the Cheyenne River Tribe and the Standing Rock Sioux Tribe for land needed for the Oahe Dam and Reservoir. See ch. 1120, 64 Stat. 1093.

[2] The Tribe received a total of $10,644,014 in exchange for the 104,420 acres of land and interests therein taken by the United States. This amount included compensation for the loss of wildlife, the loss of revenue from grazing permits, the costs of negotiating the agreement, and the costs of "complete rehabilitation" of all resident members and the restoration of tribal life. See §§ 2, 5, and 13, 68 Stat. 1191–1194.

Pursuant to the Flood Control Act, the United States also acquired for the Oahe Dam and Reservoir Project an additional 18,000 acres that were owned in fee by non-Indians.[3]

Although the Tribe conveyed all interests in the 104,420 acres of former trust lands to the United States,[4] the Cheyenne River Act reserved to the Tribe or tribal members certain rights respecting the use of these lands. Section 6 reserved "mineral rights" to the Tribe or individual tribal landowners, "subject to all reasonable regulations, which may be imposed by the [Army's] Chief of Engineers." *Id.*, at 1192. Section 7 gave tribal members the right "without charge to cut and remove all timber and to salvage . . . improvements" until the dam area was impounded. *Ibid.* Section 9 allowed tribal members to continue residing on the taken land until closure of the dam's gates. *Id.*, at 1192–1193. Section 10 provided that the Tribe would have the right to "graze stock" on the taken lands and that:

> "[The] Tribal Council and the members of said Indian Tribe shall have, without cost, the right of free *access* to the shoreline of the reservoir including the *right* to hunt and fish in and on the aforesaid shoreline and reservoir, *subject, however, to regulations governing the corresponding use by other citizens of the United States." Id.*, at 1193 (emphasis added).[5]

---

[3] The record does not reflect how these lands had come to be owned by non-Indians.

[4] The question on which we granted certiorari assumes the United States acquired these lands in fee, and the District Court referred to the "transfer of fee ownership from the Tribe to the United States." App. 125. The Court of Appeals, however, referred to the lands as "neither non-Indian-owned fee land nor trust land." 949 F. 2d 984, 990 (CA8 1991). Because the nature of the Government's title is not relevant to our analysis, we may assume that the United States owns the 104,420 acres in fee.

[5] The Cheyenne River Act became effective upon confirmation and acceptance in writing by "three-quarters of the adult Indians of the Cheyenne River Reservation in South Dakota." 68 Stat. 1191. Of the Indians eligible to vote, 75.35% approved the Act; of those who actually voted, 92% voted for approval. See App. 266.

Before this dispute arose, both the Tribe and the State of South Dakota enforced their respective game and fish regulations in the taken area. The Tribe enforced its regulations against all violators; the State limited its enforcement to non-Indians. In 1988, following a dispute between the State and the tribal respondents regarding the 1988 deer hunting season, the Tribe announced that it would no longer recognize state hunting licenses and that hunters within the reservation would be "subject to prosecution in tribal court" unless licensed by the Tribe. App. 58. In response, the State filed this action against the Chairman of the Cheyenne River Sioux Tribe and the Director of Cheyenne River Sioux Tribe Game, Fish and Parks. In its complaint, the State sought to enjoin the Tribe from excluding non-Indians from hunting on nontrust lands within the reservation. In the alternative, the State sought a declaration that the federal takings of tribal lands for the Oahe Dam and Reservoir had reduced the Tribe's authority by withdrawing these lands from the reservation. *Id.*, at 39–40 (Second Amended Complaint). The District Court concluded that the Cheyenne River Act "did not disestablish the Missouri River boundary of the Cheyenne River Reservation." *Id.*, at 103. Nevertheless, relying on *Montana* v. *United States*, 450 U. S. 544 (1981), the District Court held that § 10 of the Cheyenne River Act clearly abrogated the Tribe's right to exclusive use and possession of the former trust lands. App. 125. The court further found that "Congress has not expressly delegated to the Tribe hunting and fishing jurisdiction over nonmembers" on the taken lands.[6] *Id.*, at 149. The District Court perma-

---

[6] Although the District Court ruled on the issue of the Tribe's regulatory jurisdiction over Indians who are not members of the Cheyenne River Sioux, the Court of Appeals vacated that portion of the opinion. It noted that the "issue of tribal jurisdiction over nonmember Indians was neither pled nor tried; the complaint was limited to the question of jurisdiction over non-Indians." 949 F. 2d, at 990. The State did not raise this issue in its petition for certiorari, and hence the only question before us is whether the Tribe may regulate non-Indians who hunt and fish in the taken area.

nently enjoined the Tribe and its members from exerting such authority.[7]

The Court of Appeals affirmed in part, reversed in part, and remanded. 949 F. 2d 984 (CA8 1991). The court distinguished between the 104,420 acres of former trust lands acquired pursuant to the Cheyenne River Act and the 18,000 acres of former non-Indian fee lands acquired pursuant to the Flood Control Act. As to the former trust lands, the court held that the Tribe had authority to regulate non-Indian hunting and fishing because the Cheyenne River Act did not clearly reveal Congress' intent to divest the Tribe of its treaty right to do so. As to the 18,000 acres of former fee lands, however, the court found that *Montana* v. *United States* and *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408 (1989), controlled. Assuming the 18,000 acres had previously been held in fee by non-Indians pursuant to one of the Allotment Acts, the Court of Appeals noted that:

> "Since *Montana* held that tribes have been divested of their regulatory authority over non-Indians hunting and fishing on land held in fee by non-Indians pursuant to an

---

[7] The District Court found no evidence that the Tribe has ever imposed criminal sanctions on a nonmember who violated tribal hunting or fishing ordinances. App. 87. Throughout this litigation, respondents have disavowed any criminal jurisdiction over nonmembers, asserting instead that the sanctions they seek to impose on unlicensed hunters and fishermen are purely civil in nature. *Id.*, at 85. The State, however, has contended that these tribal regulations will be enforced through criminal sanctions. The District Court dismissed the State's request for a declaration that the Tribe has "no jurisdiction" to arrest and try non-Indians on the reservation, on the ground that the "purported controversy lacks sufficient immediacy and reality." *Id.*, at 88 (internal quotation marks omitted). In any event, we have previously held that "the inherent sovereignty of the *Indian* tribes does not extend to criminal jurisdiction over non-Indians who commit crimes on the reservation." *Duro* v. *Reina*, 495 U. S. 676, 684 (1990) (emphasis added). See also *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191, 210 (1978).

allotment act, the lack of a grant of such power requires us to conclude that the Tribe does not possess such authority, unless one of the *Montana* exceptions is met." 949 F. 2d, at 995.[8]

The Eighth Circuit therefore remanded the case for a determination whether the Tribe could regulate non-Indian hunting and fishing on the former fee lands pursuant to one of the exceptions to the general rule that an Indian tribe's inherent sovereign powers do not extend to non-Indian activity. We granted certiorari, 506 U. S. 813 (1992), and now reverse.

## II

Congress has the power to abrogate Indians' treaty rights, see, *e. g., Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 594 (1977), though we usually insist that Congress clearly express its intent to do so. See *Menominee Tribe* v. *United States*, 391 U. S. 404, 412–413 (1968); *United States* v. *Dion*, 476 U. S. 734, 738 (1986). See also *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992) ("'[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit'") (citations omitted). Our reading of the relevant statutes persuades us that Congress has abrogated the Tribe's rights under the Fort Laramie Treaty to regulate hunting and fishing by non-Indians in the area taken for the Oahe Dam and Reservoir Project.

The Fort Laramie Treaty granted to the Cheyenne River Sioux Tribe the unqualified right of "absolute and undis-

---

[8] Although respondents did not cross-petition for review of this portion of the Court of Appeals' decision, the State argues that the Court of Appeals' general approach in distinguishing between the 18,000 acres of non-Indian fee lands and the 104,420 acres of former trust lands was "without basis in this Court's rulings," and thus "wrong and unworkable." Brief for Petitioner 48. We read the question presented as fairly encompassing the issue of the Tribe's regulatory authority over both the 18,000 acres of former non-Indian fee lands and the 104,420 acres of former trust lands.

turbed use and occupation" of their reservation lands. 15 Stat. 636. We have interpreted identical language in a parallel treaty between the United States and the Crow Tribe as embracing the implicit "power to exclude others" from the reservation and thereby "arguably conferr[ing] upon the Tribe the authority to control fishing and hunting on those lands." *Montana* v. *United States, supra,* at 558–559 (construing the second Fort Laramie Treaty, 15 Stat. 649). Thus, we may conclude that pursuant to its original treaty with the United States, the Cheyenne River Tribe possessed both the greater power to exclude non-Indians from, and arguably the lesser included, incidental power to regulate non-Indian use of, the lands later taken for the Oahe Dam and Reservoir Project.

Like this case, *Montana* concerned an Indian Tribe's power to regulate non-Indian hunting and fishing on lands located within a reservation but no longer owned by the Tribe or its members. Under the General Allotment Act of 1887, ch. 119, 24 Stat. 388, as amended, 25 U. S. C. § 332 *et seq.,* and the Crow Allotment Act of 1920, ch. 224, 41 Stat. 751, Congress had provided for certain Crow lands to be conveyed in fee to non-Indians for homesteading. We held that because the Tribe thereby lost the right of absolute use and occupation of lands so conveyed, the Tribe no longer had the incidental power to regulate the use of the lands by non-Indians. See 450 U. S., at 559. Similarly, six Members of this Court, in *Brendale* v. *Confederated Tribes,* determined that at least with regard to the "open" portion of the Yakima Reservation, the Yakima Tribe had lost the authority to zone lands that had come to be owned in fee by non-Indians. 492 U. S., 423–424 (opinion of WHITE, J.); *id.,* at 444–445 (opinion of STEVENS, J.). Because significant portions of that part of the reservation had been allotted under the General Allotment Act and had passed to non-Indians, those Justices concluded that the treaty's "exclusive use and benefit" provision was inapplicable to those lands and therefore could not con-

fer tribal authority to regulate the conduct of non-Indians there. *Id.*, at 422, 445.

*Montana* and *Brendale* establish that when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands. The abrogation of this greater right, at least in the context of the type of area at issue in this case,[9] implies the loss of regulatory jurisdiction over the use of the land by others. In taking tribal trust lands and other reservation lands for the Oahe Dam and Reservoir Project, and broadly opening up those lands for public use, Congress, through the Flood Control and Cheyenne River Acts eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe.

The Flood Control Act authorized the construction, management, and operation of public recreational facilities on the lands taken for the Oahe Reservoir. § 4, 58 Stat. 889, as amended, 16 U. S. C. § 460d. Section 4 of the Act provides that "all such projects shall be open to public use generally" for various "recreational purposes, . . . when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the Secretary of the Army may deem necessary." Section 4 further mandates "ready access to and exit from such water areas . . . for general public use." Thus, the clear effect of the Flood Control Act is to open the lands taken for the Oahe Dam and Reservoir Project for the general recreational use. of the public. Because hunting and fishing are "recreational purposes," the Flood Control Act affirmatively allows non-Indians to hunt and fish on such lands, subject to federal

---

[9] The District Court found that the taken area is not a "closed" or pristine area, and the Court of Appeals did not disturb that finding. 949 F. 2d, at 995. We agree that the area at issue here has been broadly opened to the public. Thus, we need not reach the issue of a tribe's regulatory authority in other contexts.

regulation. The Act also clearly prohibits any "use" of the lands "which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated" or which is determined by the Secretary of the Army to be "contrary to the public interest." *Ibid.*

If the Flood Control Act leaves any doubt whether the Tribe retains its original treaty right to regulate non-Indian hunting and fishing on lands taken for federal water projects, the Cheyenne River Act extinguishes all such doubt. Section II of that Act declares that the sum paid by the Government to the Tribe for former trust lands taken for the Oahe Dam and Reservoir Project, "shall be in final and complete settlement of all claims, rights, and demands" of the Tribe or its allottees. 68 Stat. 1191. This provision reliably indicates that the Government and the Tribe understood the Act to embody the full terms of their agreement, including the various rights that the Tribe and its members would continue to enjoy after conveying the 104,420 acres to the Government.[10] The Tribe's § IX "right of *free access* to the shoreline of the reservoir includ[es] *the right to hunt and fish*" but is "*subject . . . to regulations governing the corresponding use by other citizens of the United States.*" *Id.,* at 1193 (emphasis added). If Congress had intended by this provision to grant the Tribe the additional right to regulate hunting and fishing, it would have done so by a similarly explicit statutory command. The rights granted the Tribe in § IX stand in contrast to the expansive treaty right originally granted to the Tribe of "absolute and undisturbed use," which *does* encompass the right to exclude and to regulate. See *Montana,* 450 U. S., at 554, 558.

---

[10] The dissent apparently finds ambiguity in this provision, on the ground that it "does not address the question of *which* rights Congress intended to take." *Post,* at 703. The self-evident answer is that when Congress used the term "all claims, rights, and demands" of the Tribe, 68 Stat. 1191, it meant *all* claims, rights, and demands.

At oral argument, respondents insisted that they did not claim the right to *exclude* nonmembers from the taken area, but only the right to *prevent* nonmembers from hunting or fishing without appropriate tribal licenses. See Tr. of Oral Arg. 27–28, 30–31. It is ultimately irrelevant whether respondents claim a power to exclude.[11] Congress gave the Army Corps of Engineers, not the Tribe, regulatory control over the taken area. And as we have noted, an abrogated treaty right of unimpeded use and occupation of lands "can no longer serve as the basis for tribal exercise of the lesser included power" to regulate. *Brendale*, 492 U. S., at 424. In the absence of applicable Army Corps regulations allowing the Tribe to assert regulatory jurisdiction over the project lands, we conclude that the Flood Control Act's open-access mandate and the Cheyenne River Act's relevant provisions affirmatively abrogate the Tribe's authority to regulate entry onto or use of these lands.[12]

The Court of Appeals found *Montana* inapposite with respect to the 104,420 acres of former trust lands because "[t]he purpose of the [Cheyenne River] Act, unlike that of the Allotment Act at issue in *Montana*, was not the destruction of tribal self-government, but was only to acquire the property rights necessary to construct and operate the Oahe Dam and Reservoir." 949 F. 2d, at 993. To focus on purpose is to misread *Montana*. In *Montana*, the Court did refer to the purpose of the Allotment Acts and discussed the legislative debates surrounding the allotment policy, as well as Congress' eventual repudiation of the policy in 1934 by the In-

---

[11] Certainly, the power to regulate is of diminished practical use if it does not include the power to exclude: Regulatory authority goes hand in hand with the power to exclude. See *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 423–424 (1989) (opinion of WHITE, J.).

[12] We do not address whether South Dakota has regulatory control over hunting and fishing in the taken area. In its declaratory judgment action, the State sought only a judicial determination regarding the Tribe's claim to regulatory jurisdiction.

dian Reorganization Act, 45 Stat. 984, 25 U. S. C. § 461 *et seq.*
450 U. S., at 559–560, n. 9. However, at the end of this dis-
cussion, the Court unequivocally stated that "what is rele-
vant . . . is the *effect of the land alienation occasioned by
that policy on Indian treaty rights tied to Indian use and
occupation of reservation land.*" 450 U. S., at 560, n. 9 (em-
phasis added). Thus, regardless of whether land is conveyed
pursuant to an Act of Congress for homesteading or for flood
control purposes, when Congress has broadly opened up such
land to non-Indians, the effect of the transfer is the destruc-
tion of pre-existing Indian rights to regulatory control.[13] Al-
though *Montana* involved lands conveyed in fee to non-
Indians within the Crow Reservation, *Montana*'s framework
for examining the "effect of the land alienation" is applicable
to the federal takings in this case.

The takings at issue here do differ from the conveyances
of fee title in *Montana*, however, in that the terms of the

---

[13] The dissent argues that our reliance on *Montana* v. *United States*
and *Brendale* is misplaced and insists that in *Montana* we did not reject
the relevance of congressional purpose, but merely "specifie[d] *which* con-
gressional purpose is relevant—*i. e.*, its purpose at the time Indian land is
alienated." *Post*, at 702. We are unable to wring such meaning out of
*Montana*'s simple statement that "what is relevant . . . is the *effect of the
land alienation.*" 450 U. S., at 560, n. 9 (emphasis added).

Moreover, even when the dissent engages in the congressional purpose
inquiry that *Montana* eschews, it errs in stating that Congress "simply
wished to build a dam." *Post*, at 698. In fact, as the dissent acknowl-
edges, *post*, at 702, Congress in the Flood Control Act also mandated that
the water projects serve as recreational facilities for the general public
for activities such as "boating, swimming, bathing, [and] fishing," subject
to such "rules and regulations as the Secretary of the Army may deem
necessary." 16 U. S. C. § 460d. Contrary to the dissent's reasoning, see
*post*, at 700, that Congress vested the Secretary of the Army with broad
regulatory authority over the management of these lands is *explicit* evi-
dence that Congress "considered the possibility that by taking the land
. . . it would deprive the Tribe of its authority to regulate non-Indian
hunting and fishing on that land." *Ibid.*

Cheyenne River Act preserve certain limited land-use rights belonging to the Tribe. It could be argued that by reserving these rights, Congress preserved the right to regulate use of the land by non-Indians. Thus, the Court of Appeals treated the mineral, grazing, and timber rights retained by the Tribe under the Cheyenne River Act as evidence that the taking "was not a simple conveyance of land and all attendant interests in the land," 949 F. 2d, at 993, and the court accordingly concluded that Congress had not abrogated the Tribe's pre-existing regulatory authority. We disagree. Congress' explicit reservation of certain rights in the taken area does not operate as an implicit reservation of all former rights.

Our decision in *United States* v. *Dion*, 476 U. S. 734 (1986), supports this conclusion. In *Dion*, we considered whether an Indian who takes an eagle on tribal land violates the Bald Eagle Protection Act.[14] We demanded "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.*, at 740. The Bald Eagle Protection Act contains an exemption allowing the Secretary of the Interior to permit the taking of an eagle "for the religious purposes of Indian tribes" and for other narrow purposes found to be compatible with the goal of eagle preservation. 16 U. S. C. § 668a. We found this exemption "difficult to explain except as a reflection of an understanding that the statute otherwise bans the taking of eagles by Indians." 476 U. S., at 740. Likewise, we cannot explain § X of the Cheyenne River Act and § 4 of the Flood Control Act except as indications that Congress sought to divest the Tribe of its right to "absolute and undisturbed use and occupation" of the taken area. When Congress reserves limited rights to a tribe or its mem-

---

[14] The Bald Eagle Protection Act makes it a federal crime to "take, possess, sell, purchase, [or] barter . . . any bald eagle . . . or any golden eagle." 16 U. S. C. § 668(a).

bers, the very presence of such a limited reservation of rights suggests that the Indians would otherwise be treated like the public at large.

### III

Respondents and their *amici* raise several alternative arguments, none of which undercuts our statutory analysis. Respondents argue, for example, that their right to regulate hunting and fishing in the taken area was not abrogated because the $10,644,014 appropriated in the Cheyenne River Act did not include compensation for the Tribe's loss of licensing revenue. This sum, respondents argue, did include payment for, *inter alia,* the loss of grazing permit revenues and the destruction of wildlife, wild fruit, and other natural resources, as those losses were itemized in the House Report on the Cheyenne River Act. See Brief for Respondents 9 (citing H. R. Rep. No. 2484, 83d Cong., 2d Sess., 4 (1954)). To hold their regulatory authority divested, respondents contend, would imply that Congress breached its duty to compensate the Tribe for all taken resources. The Act itself, however, does not itemize the losses covered by the compensation but rather plainly states that the appropriated funds constitute a "final and complete settlement of all claims, rights, and demands" of the Tribe arising out of the Oahe Dam and Reservoir Project. § II, 68 Stat. 1191. Given the express text of the Act, we will not conclude that the Act reserved to the Tribe the right to regulate hunting and fishing simply because the legislative history does not include an itemized amount for the Tribe's loss of revenue from licensing those activities.

General principles of "inherent sovereignty" also do not enable the Tribe to regulate non-Indian hunting and fishing in the taken area. Although Indian tribes retain inherent authority to punish members who violate tribal law, to regulate tribal membership, and to conduct internal tribal relations, *United States* v. *Wheeler,* 435 U. S. 313, 326 (1978), the "exercise of tribal power beyond what is necessary to protect

tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation," *Montana*, 450 U. S., at 564. Having concluded that Congress clearly abrogated the Tribe's pre-existing regulatory control over non-Indian hunting and fishing, we find no evidence in the relevant treaties or statutes that Congress intended to allow the Tribe to assert regulatory jurisdiction over these lands pursuant to inherent sovereignty.[15]

The question remains, however, whether the Tribe may invoke other potential sources of tribal jurisdiction over non-Indians on these lands. *Montana* discussed two exceptions to "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.*, at 565. First, a tribe may license or otherwise regulate activities of nonmembers who enter "consensual relationships" with the tribe or its members through contracts, leases, or other commercial dealings. *Ibid.* Second, a "tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 566. The District Court made extensive findings that neither of these exceptions applies to either the former trust lands or the former fee lands. See App. 142–149. And although the Court of Appeals instructed the District Court

---

[15] The dissent's complaint that we give "barely a nod" to the Tribe's inherent sovereignty argument, *post*, at 698, is simply another manifestation of its disagreement with *Montana*, which announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U. S., at 565. While the dissent refers to our "myopic focus," *post*, at 701, on the Tribe's prior treaty right to "absolute and undisturbed use and occupation" of the taken area, it shuts both eyes to the reality that after *Montana*, tribal sovereignty over nonmembers "cannot survive without express congressional delegation," 450 U. S., at 564, and is therefore *not* inherent.

to undertake a new analysis of the *Montana* exceptions on remand as to the 18,000 acres, it did not pass upon the District Court's previous findings regarding the taken area as a whole. See 949 F. 2d, at 995. Thus, we leave this to be resolved on remand.

Finally, respondents contend that Army Corps regulations permit the Tribe to regulate non-Indian hunting and fishing. Although Congress abrogated the Tribe's right to regulatory control in the taken area through the Flood Control and Cheyenne River Acts, it gave primary regulatory authority over the water project lands to the Army Corps of Engineers. 16 U. S. C. §460d. See 36 CFR §327.1(a) (1992). The Corps has authority to promulgate regulations "not inconsistent with . . . treaties and Federal laws and regulations" concerning "the rights of Indian Nations." §327.1(f). The Corps permits "[h]unting, fishing and trapping . . . except in areas where prohibited by the District Engineer." §327.8. This regulation provides that "[a]ll Federal, state and *local* laws governing these activities apply on project lands and waters, as regulated by authorized enforcement officials." *Ibid.* (emphasis added). See also §327.26. Respondents argue that these regulations "not only *allow* for tribal regulation of hunting and fishing, they *affirmatively establish* the primacy of tribal treaty rights over both public use rights and state and federal regulatory interests." Brief for Respondents 33 (emphasis in original) (footnote omitted). Insisting that "tribal" law is a subset of "local" law, respondents contend that the Tribe's hunting and fishing laws apply to all who pass through the taken area. *Id.,* at 33, n. 39.

Respondents did not rely on the Army Corps' regulations in the proceedings below. And although the United States as *amicus curiae* asserted at oral argument that §327.8 leaves all pre-existing state, local, *and* tribal hunting and fishing regulations in effect on project lands, see Tr. of Oral Arg. 50, it did not even mention the Army Corps regulation

in its brief. Moreover, it is inconsistent with evidence in the record that the Corps in fact believed that jurisdiction over non-Indian hunting and fishing on water project lands is a matter of *state* law.[16]   See App. 288, 284. Thus, we find this argument undeveloped. Under these circumstances, we decline to defer to the Government's litigating position.

## IV

"[T]reaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." *Montana*, 450 U. S., at 561. In this case, the United States took former trust lands pursuant to the Flood Control Act, which mandated that all water project lands be open for the general public's use and recreational enjoyment. The Cheyenne River Act reserved some of the Tribe's original treaty rights in the former trust lands (including the right to hunt and fish) but not the right to exert regulatory control. These statutes clearly abrogated the Tribe's "absolute and undisturbed use and occupation" of these tribal lands, 15 Stat. 636, and thereby deprived the Tribe of the power to license non-Indian use of the lands. Accordingly, the judgment of the Court of Appeals is reversed, and the case

---

[16] The dissent simply assumes that the phrase "local laws" in 36 CFR §327.8 (1992) includes "tribal" laws. *Post*, at 702–703. However, an Army Corps regulation outlining the procedures for evaluating Department of the Army water use permit applications indicates that the Army Corps, in fact, distinguishes between the terms "tribal" and "local." See 33 CFR §320.4(j)(2) (1992) ("[t]he primary responsibility for determining zoning and land use matters rests with state, *local* and *tribal* governments") (emphasis added). Furthermore, we are bewildered that the dissent cites §327.1(f) for the proposition that "the regulations themselves provide that tribal rights prevail." *Post*, at 702–703. Section 327.1(f) provides that the regulations in part 327 apply "to the extent that [they] are not inconsistent with . . . treaties and Federal laws and regulations." This is simply to say that the regulations do not purport to abrogate treaty rights—not a startling proposition. The regulation says nothing about whether the Flood Control Act or Cheyenne River Act has already terminated those rights.

is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE SOUTER joins, dissenting.

The land at issue in this case is part of the Cheyenne River Sioux Reservation.[1] The United States did not take this land with the purpose of destroying tribal government or even with the purpose of limiting tribal authority. It simply wished to build a dam. The Tribe's authority to regulate hunting and fishing on the taken area is consistent with the uses to which Congress has put the land, and, in my view, that authority must be understood to continue until Congress clearly decides to end it.

The majority's analysis focuses on the Tribe's authority to regulate hunting and fishing under the Fort Laramie Treaty of 1868, 15 Stat. 635, see *ante,* at 687–694, with barely a nod acknowledging that the Tribe might retain such authority as an aspect of its inherent sovereignty, see *ante,* at 694–695. Yet it is a fundamental principle of federal Indian law that Indian tribes possess "'inherent powers of a limited sovereignty which has never been extinguished.'" *United States* v. *Wheeler,* 435 U. S. 313, 322 (1978) (emphasis omitted), quoting F. Cohen, Handbook of Federal Indian Law 122 (1945). This Court has recognized that the inherent sovereignty of Indian tribes extends "'over both their members *and their territory.'*" 435 U. S., at 323 (emphasis added), quoting *United States* v. *Mazurie,* 419 U. S. 544, 557 (1975). Inherent tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance. *But until*

---

[1] The District Court found that conveyance of the taken area to the United States did not diminish the reservation, see App. 96–104, and South Dakota did not appeal that determination. See also 949 F. 2d 984, 990 (CA8 1991) (case below) ("[I]t seems clear . . . that the Cheyenne River Act did not disestablish the boundaries of the Reservation").

*Congress acts, the tribes retain their existing sovereign powers.* In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a *necessary* result of their dependent status." 435 U. S., at 323 (emphases added). This Court has found implicit divestiture of inherent sovereignty necessary only "where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights." *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 153–154 (1980).[2]

The Fort Laramie Treaty confirmed the Tribe's sovereignty over the land in question in the most sweeping terms by providing that it be "set apart for the absolute and undisturbed use and occupation of the [Sioux]." 15 Stat. 636. The majority acknowledges that this provision arguably conferred "'upon the Tribe the authority to control hunting and fishing on those lands.'" *Ante,* at 688, quoting *Montana* v. *United States,* 450 U. S. 544, 558–559 (1981). Because "treaties should be construed liberally in favor of the Indians,"

---

[2] Neither South Dakota nor the majority is able to identify any overriding federal interest that would justify the implicit divestiture of the Tribe's authority to regulate non-Indian hunting and fishing. In rejecting the Tribe's inherent sovereignty argument, the majority relies on the suggestion in *Montana* v. *United States,* 450 U. S. 544 (1981), that "the 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" *Ante,* at 694–695, quoting *Montana,* 450 U. S., at 564. I already have had occasion to explain that this passage in *Montana* is contrary to 150 years of Indian-law jurisprudence and is not supported by the cases on which it relied. See *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 450–456 (1989) (opinion concurring in judgment and dissenting). There is no need to repeat that explanation here.

*County of Oneida* v. *Oneida Indian Nation,* 470 U. S. 226, 247 (1985), the majority is right to proceed on the assumption that authority to control hunting and fishing is included in the Fort Laramie Treaty.

The question, then, is whether Congress intended to abrogate the Tribe's right to regulate non-Indian hunting and fishing on the taken area—a right flowing from its original sovereign power that was expressly confirmed by treaty. This Court does not lightly impute such an intent to Congress. There must be "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *United States* v. *Dion,* 476 U. S. 734, 740 (1986); see also *Wheeler,* 435 U. S., at 323 (implicit withdrawal of inherent sovereignty only where "necessary"); *Colville,* 447 U. S., at 153–154 (same).

The majority, however, points not even to a scrap of evidence that Congress actually considered the possibility that by taking the land in question it would deprive the Tribe of its authority to regulate non-Indian hunting and fishing on that land. Instead, it finds Congress' intent *implicit* in the fact that Congress deprived the Tribe of its right to exclusive use of the land, that Congress gave the Army Corps of Engineers authority to regulate public access to the land, and that Congress failed explicitly to reserve to the Tribe the right to regulate non-Indian hunting and fishing. Despite its citation of *Dion, supra, Menominee Tribe* v. *United States,* 391 U. S. 404 (1968), and *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251 (1992), see *ante,* at 687, the majority adopts precisely the sort of reasoning-by-implication that those cases reject.

The majority supposes that the Tribe's right to regulate non-Indian hunting and fishing is incidental to and dependent on its treaty right to exclusive use of the area and that the Tribe's right to regulate was therefore lost when its right to

exclusive use was abrogated. See *ante,* at 689. This reasoning fails on two counts. First, treaties "'must . . . be construed, not according to the technical meaning of [their] words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.'" *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658, 676 (1979), quoting *Jones* v. *Meehan,* 175 U. S. 1, 11 (1899). I find it implausible that the Tribe here would have thought every right subsumed in the Fort Laramie Treaty's sweeping language to be defeated the moment they lost the right to exclusive use of their land. Second, the majority's myopic focus on the Treaty ignores the fact that this Treaty merely confirmed the Tribe's preexisting sovereignty over the reservation land. Even on the assumption that the Tribe's treaty-based right to regulate hunting and fishing by non-Indians was lost with the Tribe's power to exclude non-Indians, its *inherent* authority to regulate such hunting and fishing continued.

The majority's reliance on *Montana* and *Brendale* in this regard is misplaced. In those cases, the reservation land at issue had been conveyed in fee to non-Indians pursuant to the Indian General Allotment Act of 1887, 24 Stat. 388, which aimed at the eventual elimination of reservations and the assimilation of Indian peoples. See *Montana,* 450 U. S., at 559, n. 9. In *Montana,* the Court concluded: "It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government." *Id.,* at 560, n. 9. See also *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 423 (1989) (opinion of WHITE, J.). The majority finds the purpose for which the land is alienated irrelevant, relying on *Montana's* statement that "'what is relevant . . . is the *effect of the land alienation occasioned by that policy on Indian treaty rights tied to Indian use and occupation of reservation land.'"

*Ante,* at 692, quoting *Montana,* 450 U. S., at 560, n. 9 (emphasis added by Court). This statement, however, simply responded to an argument that "[t]he policy of allotment and sale of surplus reservation land was . . . repudiated in 1934." *Ibid.* Read in context, the language on which the majority relies in no way rejects Congress' purpose as irrelevant but rather specifies *which* congressional purpose is relevant— *i. e.,* its purpose at the time Indian land is alienated.

· In this case, as the majority acknowledges, see *ante,* at 683–684, Congress' purpose was simply to build a dam. Congress also provided that the taken area should be open to non-Indians for "recreational purposes." See *ante,* at 689. But these uses of the land are perfectly consistent with continued tribal authority to regulate hunting and fishing by non-Indians. To say that non-Indians may hunt and fish in the taken area is not to say that they may do so free of tribal regulation any more than it is to say that they may do so free of state or federal regulation. Even if the Tribe lacks the power to exclude, it may sanction with fines and other civil penalties those who violate its regulations.

Apparently the majority also believes that tribal authority to regulate hunting and fishing is inconsistent with the fact that Congress has given the Army Corps of Engineers authority to promulgate regulations for use of the area by the general public. See *ante,* at 691, 692, and n. 13. I see no inconsistency. The Corps in fact has decided not to promulgate its own hunting and fishing regulations and instead has provided that "[a]ll Federal, state and local laws governing [hunting, fishing, and trapping] apply on project lands and waters." 36 CFR § 327.8 (1992); see Tr. of Oral Arg. 50. This regulation clearly envisions a system of *concurrent* jurisdiction over hunting and fishing in the taken area. The majority offers no explanation why concurrent jurisdiction suddenly becomes untenable when the local authority is an Indian tribe. To the extent that such a system proves unworkable, the regulations themselves provide that tribal

rights prevail, for part 327 applies to "lands and waters which are subject to treaties and Federal laws and regulations concerning the rights of Indian Nations" only to the extent that part 327 is "not inconsistent with such treaties and Federal laws and regulations." § 327.1(f).

In its search for a statement from Congress abrogating the Tribe's right to regulate non-Indian hunting and fishing in the taken area, the majority turns to a provision in the Cheyenne River Act that the compensation paid for the taken area "'shall be in final and complete settlement of all claims, rights, and demands' of the Tribe." *Ante,* at 690, quoting Pub. L. 776, § II, 68 Stat. 1191. But this provision simply makes clear that Congress intended no further compensation for the rights it took from the Tribe. It does not address the question of *which* rights Congress intended to take or, more specifically, whether Congress intended to take the Tribe's right to regulate hunting and fishing by non-Indians. The majority also relies on the fact that § IX of the Act expressly reserved to the Tribe the right to hunt and fish but not the right to regulate hunting and fishing. See *ante,* at 690. To imply an intent to abrogate Indian rights from such congressional silence once again ignores the principles that "Congress' intention to abrogate Indian treaty rights be clear and plain," *Dion,* 476 U. S., at 738, and that "'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *County of Yakima,* 502 U. S., at 269, quoting *Montana* v. *Blackfeet Tribe,* 471 U. S. 759, 766 (1985). Congress' failure to address the subject of the Tribe's regulatory authority over hunting and fishing means that the Tribe's authority survives and not the reverse.[3]

---

[3] The majority's assertion that this Court's decision in *United States* v. *Dion,* 476 U. S. 734 (1986), supports its conclusion here, see *ante,* at 693, is difficult to fathom. In *Dion,* this Court found that an exemption in the Bald Eagle Protection Act permitting the taking of eagles for religious purposes was "difficult to explain except as a reflection of an understand-

It is some small consolation that the Court's decision permits the Federal Government to remedy this situation with a more explicit regulation authorizing the Tribe to regulate hunting and fishing in the taken area. See *ante*, at 691. I regret, however, that the Court's decision makes such action necessary. I dissent.

---

ing that the statute otherwise bans the taking of eagles by Indians." 476 U. S., at 740. The Court correctly notes that § X of the Cheyenne River Act and § 4 of the Flood Control Act cannot be understood except as indications that Congress intended to divest the Tribe of its right to exclusive use of the taken area. See *ante*, at 693. It does not follow, however, that Congress intended to divest the Tribe of its right to regulate the hunting and fishing of non-Indians in the taken area. As already noted, continued tribal authority over hunting and fishing is consistent with public access. And it certainly does not follow from *Dion*, that "[w]hen Congress reserves limited rights to a tribe or its members, the very presence of such a limited reservation of rights suggests that the Indians would otherwise be treated like the public at large." *Ante*, at 693–694. Indeed, *Dion* stands for the directly opposite presumption that implicit abrogation of treaty rights is disfavored and that "clear evidence" is required "that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." 476 U. S., at 740.