STATE OF SOUTH DAKOTA, in
its own behalf, and as parens
patriae, Appellee,

v.

Gregg BOURLAND, personally and as
Chairman of the Cheyenne River Sioux
Tribe; Dennis Rousseau, personally and
as Director of Cheyenne River Sioux
Tribe Game, Fish and Parks, Appellants.

United States of America; the States of
Montana, Alabama, California, Colorado, Minnesota, North Dakota, Utah,
Washington, and Wyoming, Amicus Curiae.

STATE OF SOUTH DAKOTA, in
its own behalf, and as parens
patriae, Appellant,

v.

Gregg BOURLAND, personally and as
Chairman of the Cheyenne River Sioux
Tribe; Dennis Rousseau, personally and
as Director of Cheyenne River Sioux
Tribe Game, Fish and Parks, Appellees.

United States of America; the States of
Montana, Alabama, California, Colorado, Minnesota, North Dakota, Utah,
Washington, and Wyoming, Amicus Curiae.

Nos. 90–5486, 90–5515.

United States Court of Appeals,
Eighth Circuit.

Submitted May 9, 1994.

Decided Nov. 7, 1994.

Mark C. Van Norman, Eagle Butte, SD, argued (Steven Emery and Timothy Jopanko, on the brief), for appellant.

John P. Guhin, Pierre, SD, argued, for appellee.

Peter Appel, Edward J. Shawaker, William A. White and David C. Shilton, Washington, DC, for amicus curiae.

Before BOWMAN, Circuit Judge, HEANEY, and BRIGHT, Senior Circuit Judges.

BOWMAN, Circuit Judge.

This case is before us on remand from the United States Supreme Court. *South Dakota v. Bourland,* — U.S. —, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), *reversing* 949 F.2d 984 (8th Cir.1991), *opinion vacated and mandate recalled,* 997 F.2d 512 (8th Cir. 1993).[1] In November 1993, after remand from the Supreme Court, we issued an unpublished per curiam opinion summarily affirming the District Court, but we then granted Bourland and Rousseau's petition for rehearing by the panel. *South Dakota v. Bourland,* 13 F.3d 264 (1993). We requested supplemental briefs[2] on the only issue remaining on remand and scheduled oral argument.

In *Bourland,* the Supreme Court considered whether the Cheyenne River Sioux Tribe had authority to regulate non-Indian[3] hunting and fishing on lands located in South Dakota along and beneath the waters of the Missouri River, and within the boundaries of the Cheyenne River Reservation, which land had been taken by the United States for the construction and operation of the Oahe Dam and Reservoir, a flood control project of the United States Army Corps of Engineers. The Court concluded that Congress had abrogated any express regulatory authority the Tribe previously may have had over hunting and fishing by non-Indians in the taken area, and that the Tribe retained no authority pursuant to its inherent sovereignty. *Id.* at — — —, 113 S.Ct. at 2319–20.

The *Bourland* decision acknowledged, however, that there was another possible source of tribal jurisdiction over non-Indians in the taken lands. *Id.* at —, 113 S.Ct. at 2320. As set forth in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), there are "two exceptions to 'the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" *Bourland,* — U.S. at —, 113 S.Ct. at 2320 (quoting *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258). The Court in *Bourland* said:

> The District Court made extensive findings that neither of [the *Montana*] exceptions applies to either the former trust lands or the former fee lands [both located within the taken area]. And although the Court of Appeals instructed the District Court to undertake a new analysis of the *Montana* exceptions on remand as to the 18,000 acres [of former fee lands], it did not pass upon the District Court's previous findings regarding the taken area as a whole. Thus, we leave this to be resolved on remand.

*Bourland,* — U.S. at —, 113 S.Ct. at 2320 (citations omitted). Taking our cue from *Bourland,* we now consider the District Court's findings concerning the *Montana* exceptions.

The first of these exceptions, which permits tribal regulation pursuant to consensual relationships entered into with an Indian tribe or its members, *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258, is not relevant here, as the District Court noted. The second exception would allow the tribe to retain regulatory jurisdiction over non-Indians on the taken area if "the conduct of non-Indians" on that land "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at

---

**1.** When we use the short citation form *"Bourland"* in this opinion, except as noted *infra* p. 871, we will be referring to the Supreme Court opinion and not to our previous, and now vacated, opinion in this case, nor to any of our published orders. We refer the reader who is interested in the history of the Cheyenne River Reservation and the earlier history of this case to the Supreme Court's opinion in *Bourland.*

**2.** We have taken with the case Bourland and Rousseau's motion to file a supplemental reply brief. Our briefing schedule called for the filing of Appellee's Supplemental Brief by February 14,

1994. Oral argument was heard on May 9, 1994, and the motion concerning the supplemental reply brief was filed on May 16, 1994. The motion is denied as untimely.

**3.** We will refer to the hunters and fishermen whose activities the Tribe is prohibited from regulating as "non-Indians," as did the Supreme Court, recognizing that South Dakota did not seek review of our earlier opinion vacating the District Court's decision on the issue of the Tribe's regulatory jurisdiction over Indians who are not members of the Tribe, *see infra* p. 871, and the Supreme Court did not address it, *see*

566, 101 S.Ct. at 1258. We conclude that the District Court's factual finding set forth in its memorandum opinion—that non-Indian conduct on the taken land, relative to hunting and fishing, neither threatens nor has a direct effect on the political integrity, the economic security, or the health or welfare of the Tribe—is not clearly erroneous.[4] *See Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

The Tribe contends that the record supports a finding that the Tribe is directly affected or threatened by the conduct of non-Indian hunters and fisherman. It is true that the court found that non-Indians "may have harassed cattle grazing on the taken area or on tribal lands, failed to close pasture gates, or let down wires on fences." *South Dakota v. Ducheneaux*, Civil No. 88–3049, 1990 WL 605077, slip op. at 12 (D.S.D. Aug. 21, 1990) (hereinafter "Mem. Op."). The court also found that non-Indian deer hunting "on the taken area and the nonmember fee lands does reduce the amount of deer available to tribal members," but "does not decrease subsistence hunting by members as few deer are harvested by members for subsistence purposes." Mem. Op. at 11. These incidents undeniably are vexatious to the individual Indians affected, but we think it is plain that they do not amount to a direct effect on the political integrity, the economic security, or the health or welfare of the Tribe as a whole, and we are satisfied the District Court did not err in finding that they do not threaten these tribal concerns such that tribal regulatory authority over non-Indians attaches under the second *Montana* exception.[5] *See* Mem. Op. at 18.

We conclude the District Court was correct in permanently enjoining the Cheyenne River Sioux tribal authorities from excluding or attempting to exclude non-Indian hunters and fishermen from what is known as the taken area of the Cheyenne River Reservation, and enjoining those tribal authorities from regulating the hunting and fishing activities of non-Indians within the taken area.[6] We are constrained to point out, however, that this result does not foreclose the Tribe from seeking relief in the District Court in the future, should the improper conduct of non-Indian hunters and fishermen on the taken area escalate in severity so as to have

---

*Bourland,* —— U.S. at —— n. 6, 113 S.Ct. at 2315 n. 6.

**4.** South Dakota, and the nine amicus curiae states, have urged us to adopt the more stringent standard set forth in the plurality opinion by Justice White in *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989). *Brendale* is a zoning case in which Justice White opined that, for an Indian tribe to retain jurisdiction over non-Indians pursuant to the second *Montana* exception, "[t]he impact [on tribal interests] must be *demonstrably serious* and must *imperil* the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 431, 109 S.Ct. at 3008 (emphasis added). We neither consider nor decide whether Justice White's *Brendale* opinion modified the second *Montana* exception for cases such as that presented here. The District Court's findings were reached under the less rigid *Montana* standard, but the result we reach today, holding that those findings are not clearly erroneous and denying the Tribe regulatory authority under the second *Montana* exception, obviously would be the same under the tougher *Brendale* standard. *Cf. Pullman–Standard v. Swint*, 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982) ("where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue").

**5.** The Tribe directs our attention to the record for other alleged facts supporting its argument, "facts" that the District Court did not find: non-Indian hunters have driven and shot across the taken land, causing the Indian-owned cattle grazing there pursuant to one tribal rancher's lease agreement to become "nervous," and causing the cattle to move away from good grazing areas and water; a goat was found shot and a tribal rancher surmised the culprit was a non-Indian hunter he had seen earlier; stray birdshot from non-Indian hunters has made the Tribe's buffalo "jump," and has disturbed the herd grazing in or near the taken area. As we have noted, these incidents were not included in the District Court's factual findings. Even if we were to assume that all the alleged incidents in fact occurred, the result here would not change. When these isolated and sometimes vague reports of spotty incidents are added to the reports the District Court credited, we still are left without a direct effect on the political integrity, the economic security, or the health or welfare of the Tribe as a whole.

**6.** South Dakota did not seek a declaratory judgment that the State has regulatory jurisdiction over hunting and fishing in the taken area, and the Supreme Court did not consider the issue. *Bourland,* —— U.S. at —— n. 12, 113 S.Ct. at 2318 n. 12.

a direct effect upon the political integrity, the economic security, or the health or welfare of the Tribe as a whole, thereby warranting invocation of the second *Montana* exception to the abrogation of tribal regulation of non-Indian hunting and fishing on the taken lands.

For the reasons stated above, the judgment of the District Court is affirmed, except as to the District Court's determination that there is no tribal jurisdiction over the hunting and fishing activities of nonmember Indians within the taken area or on nonmember fee lands. As to that issue, we reinstate part III of our vacated opinion, *Bourland,* 949 F.2d at 989–90, holding that the issue was not properly before the District Court and vacating that portion of the District Court's opinion. Further, we reinstate part V of our vacated opinion, *id.* at 996, addressing South Dakota's cross-appeal.

HEANEY, Senior Circuit Judge, dissenting.

In my view, the position advanced by the United States as an amicus curiae is the correct one. The United States asserts that the district court improperly interpreted the second *Montana* exception to require an extremely strong showing that tribal regulation of non-Indian conduct on the taken lands—specifically conduct relative to hunting and fishing by non-Indians—is necessary to protect tribal welfare. The proper approach must include an analysis of whether non-Indian conduct on the taken lands has a "direct effect" on the Tribe's political or economic health or welfare.

The *Montana* exception at issue states that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct *threatens or has some direct effect* on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States,* 450 U.S. 544, 566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981), *quoted in South Dakota v. Bourland,* —— U.S. ——, ——, 113 S.Ct. 2309, 2320, 124 L.Ed.2d 606 (1993) (emphasis added). The district court recited examples of conduct that affected the Tribe.

The court found that "[d]eer harvested by nonmember hunters on the taken area and the nonmember fee lands does reduce the amount of deer available to tribal members." *South Dakota v. Ducheneaux,* Civ. 88–3049, slip op. at 11 (D.S.D. Aug. 22, 1990). It also found that nonmembers of the Tribe "may have harassed cattle grazing on the taken area or on tribal lands, failed to close pasture gates, or let down wires on fences." *Id.* at 12–13. The district court thus recognized that non-Indian conduct had affected the Tribe, yet it failed to produce any analysis of whether such conduct satisfied the "direct effect" prong of the *Montana* test.

In its analysis of the second *Montana* exception, the district court found no "threat" to the Tribe from the conduct of non-Indians who hunt and fish on the taken lands, *see id.,* but did not consider the other half of the *Montana* inquiry to see whether such conduct had a "direct effect" on the Tribe's political integrity, economic security, or health or welfare. Instead the court framed the test to allow the Tribe to exercise civil authority over non-Indian hunting and fishing activities "*only if* that conduct '*imperils*' '*significant tribal interests.*'" *Id.* at 52–53 (quoting *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. 408, 431, 109 S.Ct. 2994, 3008, 106 L.Ed.2d 343 (1989)) (emphasis added). Proceeding from this stringent standard, the district court concluded that non-Indian conduct with respect to hunting and fishing "*has not been so extreme and pervasive* as to warrant *extraordinary enforcement efforts* by state or tribal game officers." *Ducheneaux,* slip op. at 12–13 (emphasis added).

The district court erred in applying the higher standard articulated in the *Brendale* plurality opinion. The second *Montana* exception clearly covers conduct that threatens *or* has a direct effect on the Tribe. I see nothing in the Supreme Court's *Bourland* decision, which remanded this case, to indicate that *Brendale* altered the inquiry under *Montana.* Indeed, the Court in *Bourland* quoted the exact language of the *Montana* exception. The majority avoids having to decide whether *Brendale* modified the second *Montana* exception in our case by concluding

that the district court's findings were not clearly erroneous even as measured by the less rigid *Montana* standard. *See supra* at 870 n. 4. I disagree.

The majority concludes that "the District Court's factual finding set forth in its memorandum opinion—that non-Indian conduct on the taken land, relative to hunting and fishing, neither threatens nor has a direct effect on the political integrity, the economic security, or the health or welfare of the Tribe—is not clearly erroneous." *Id.* at 870. But in fact the district court *never* analyzed whether conduct by non-Indians had a "direct effect" on the Tribe and made no finding on that issue. The majority concludes that incidents such as the killing of deer by non-Indians and interference with the Tribe's cattle grazing rights "undeniably are vexatious to the individual Indians affected, but ... do not amount to a direct effect on ... the Tribe as a whole." *Id.* at 870.

The district court found that the "Tribe has always asserted jurisdiction over all hunting and fishing activities on the reservation, including nonmember fee lands and the taken area," that the "Tribe has not acquiesced to any State assertion of jurisdiction over hunting and fishing activities on the reservation," and that since the 1930s the Tribe has "required nonmembers to obtain a tribal permit to hunt or fish on the reservation." *Ducheneaux,* slip op. at 9–10. This history illustrates the Tribe's interest in regulation and its belief that it is affected by non-Indian conduct relating to hunting and fishing. In my view, in the context of the Tribe's history of regulation, the district court's finding that non-Indian hunting of deer reduces the amount available for the Tribe and the findings concerning interference with the Tribe's grazing rights are sufficient to constitute a "direct effect" on the Tribe that satisfies the second *Montana* exception.

In addition to ignoring the "direct effect" prong of the *Montana* test, the district court's conclusions regarding the impact on the Tribe of non-Indian hunting and fishing on the taken lands are further undercut by its undue focus on issues of questionable relevance to the "direct effect" inquiry. For example, the court determined that tribal hunting and fishing for subsistence purposes was not widely practiced—a questionable finding—and that the Tribe places greater management emphasis on hunting and fishing for recreation than for subsistence. *Id.* at 11. It also offered its observation that the Tribe has not been successful in developing a recreational hunting and fishing industry to pay for a large-scale management program, and thus the Tribe's economic security would not be threatened if it were now deprived of the right to regulate non-Indian hunting and fishing on the taken lands. *Id.* at 13–14. The court's opinions that the Tribe's food needs are being adequately met and that the Tribe's recreational hunting and fishing programs are at present not as well developed as they might be, however, are not directly responsive to the inquiry of whether non-Indian conduct has a "direct effect" on the Tribe. While it may be true that the Tribe's recreational industry is not so well developed that its economic security would be "threatened" if it were unable to regulate non-Indian hunting and fishing, that issue is separate from the question of whether non-Indian conduct on the taken lands has a "direct effect" on the Tribe. The court's extensive discussion of the superior financial and management resources of the State compared with the Tribe is similarly non-responsive to the "direct effect" inquiry. *See id.* at 14–17.

The district court also pointed out that the Tribe accords preferential treatment to Tribe members when establishing licensing fees and restrictions on season closings and on the type, sex, and age of deer that may be killed; that Tribe members have sometimes engaged in the same sort of interference with tribal grazing rights as have non-Indian hunters; and that it is not "necessary" for the Tribe to regulate non-Indian hunting and fishing in order to protect tribal grazing rights because those rights "can be adequately protected through the United States, the state of South Dakota, or reciprocal tribal agreements." *Id.* at 13, 17–18, 55. Again, however, though these statements may be true, they fail to address the question of whether the conduct of non-Indians with respect to hunting and fishing has a "direct

effect" on the Tribe's economic or political health or welfare so as to satisfy the second *Montana* exception. There is nothing improper in the Tribe according hunting or fishing preferences to Tribe members. Furthermore, the fact that Tribe members sometime engage in conduct affecting the Tribe that is similar to the conduct of non-Indians is irrelevant, inasmuch as the Tribe already can and does regulate the conduct of its own members. Finally, I see nothing in the case-law to indicate that under the second *Montana* exception a Tribe can regulate the harmful conduct of non-Indians only if no alternate means of protecting its interests are available.

I believe the district court misapplied the *Montana* test by ignoring the "direct effect" prong and instead considering only whether there was any "threat" or "peril" to the Tribe's economic security, political integrity, or health or welfare. I conclude that the second *Montana* exception, properly applied, has been satisfied, and therefore I respectfully dissent.