**DUNCAN ENERGY COMPANY; NBB Oil & Gas Partners (U.S.A.); Amerada Hess Corporation; Tyrex Oil Company; Turtle Mountain Gas & Oil, Inc., Appellees,**

v.

**THREE AFFILIATED TRIBES OF the FORT BERTHOLD RESERVATION; Three Affiliated Tribes Tribal Business Council; Three Affiliated Tribes Tax Commission; Wilbur D. Wilkinson Chairman, Tribal Business Council; Joseph J. Walker, Tax Commissioner, Marcus Wells, Jr., Director, Tribal Employment Rights Office, Appellants.**

No. 93–3622.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1994.

Decided June 8, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 19, 1994.*

---

* Judges Bowman and Magill would grant the suggestion.

Charles Allen Hobbs, of Washington, DC, argued, for appellant.

Brian Raymond Bjella, Bismarck, ND, argued, for appellee.

Before BEAM, LOKEN and HANSEN, Circuit Judges.

BEAM, Circuit Judge.

Wilbur D. Wilkinson, Joseph J. Walker, and Marcus Wells, Jr., officers of the Three Affiliated Tribes of the Fort Berthold Reservation ("the Tribe"),[1] appeal the district court's grant of summary judgment to various oil companies (hereinafter "Duncan Energy") challenging the Tribe's taxation and employment authority. The district court concluded that the Tribe lacked sovereign power to enforce the challenged tax statutes in the Northeast Quadrant of the Fort Berthold Reservation and enjoined the Tribe from enforcing the statutes against Duncan Energy. *Duncan Energy Co. v. The Three Affiliated Tribes*, 812 F.Supp. 1008, 1009–10 (D.N.D.1993). We reverse and remand to the district court with directions to either dismiss the case without prejudice for lack of exhaustion of tribal remedies, or to stay any

---

**1.** The district court dismissed the Three Affiliated Tribes, and the Tribal entities from this suit on the grounds of sovereign immunity. However, the real party in interest here is the Tribe. For convenience and clarity, we will refer to the remaining appellants in this case as "the Tribe."

proceedings pending an exhaustion of those remedies.

## I. BACKGROUND

The Fort Berthold Reservation ("the Reservation") was created on March 3, 1891. 26 Stat. 1032. On June 1, 1910, after negotiations with the Tribe, Congress authorized homesteading in the Northeast Quadrant of the Reservation. 36 Stat. 455. Most of the land in the Northeast Quadrant is now owned in fee by non-Tribe members. Tribe members comprise slightly more than one-third of the overall population in the Northeast Quadrant, and almost half of the Tribe members living on the Reservation live in the Northeast Quadrant. Tribe members comprise slightly more than half of the population of New Town, the principal town in the disputed region. The Tribal Government is located primarily in New Town, as is the Bureau of Indian Affairs Office.

Tribal law imposes a one-percent tax on all interests in real and personal property within the Reservation used for business or profit. Tribal Tax Code, Chapter 7. The tax is assessed on forty-five percent of the fair market value of the property. Tribal Tax Code § 706(3). Tribal law also imposes a gross production tax of one-percent on all oil and gas produced within the Reservation. Tribal Tax Code, Chapter 8. Furthermore, the Tribal Employment Rights Office Ordinance ("TERO") requires all employers within the Reservation to hire qualified Indian workers preferentially. The TERO prevents mineral developers from hiring non-Indian contractors unless no qualified, reasonably-priced Indian contractors are available.

Pursuant to leases from non-Indian landowners, Duncan Energy operates oil and gas wells in the Northeast Quadrant of the Reservation. Under Tribal law, Duncan Energy would therefore be subject to the oil and gas tax, the property tax, and the employment ordinance described above. Duncan Energy filed suit in the district court seeking to enjoin the Tribe from assessing or collecting taxes and from enforcing the TERO against their activities within the Reservation. The Tribe moved to dismiss or to remand the case to the Tribal adjudicative system. The

district court concluded that Duncan Energy need not exhaust Tribal remedies before proceeding in federal court and granted Duncan Energy's motion for summary judgment on the merits. The Tribe appeals.

## II. DISCUSSION

### A. Reservation Boundaries

As its primary ground for affirmance, Duncan Energy contends that the 1910 Act, which opened the Reservation for homesteading, diminished the Reservation. If we were to adopt this contention, it would end our inquiry in this case; the Northeast Quadrant would no longer be part of the Fort Berthold Reservation, and the Tribes would not have jurisdiction to regulate activities there. However, this court has previously ruled that the 1910 Act did not diminish the Reservation. *New Town v. United States,* 454 F.2d 121 (8th Cir.1972). Duncan Energy suggests that *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), an intervening Supreme Court decision, nullifies our prior disposition of this issue. We disagree.

We are convinced that *Solem* did not articulate a new framework for analyzing questions of reservation diminishment. In rendering its decision, the *Solem* Court specifically noted that "our precedents in the area have established a fairly clean analytical structure." *Id.* at 470, 104 S.Ct. at 1166. *Solem* merely restates and applies this same analytical structure, albeit more concisely. Just this term, the Supreme Court revisited the issue of how to determine whether a Surplus Land Act diminished a reservation or merely offered non-Indians the opportunity to purchase land within established reservation boundaries. *Hagen v. Utah,* —— U.S. ——, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). The Court reiterated the same longstanding legal framework employed in *Solem.* Our reading of *Hagen* and *Solem* only confirms our previous conclusion; the 1910 Act did not diminish the Fort Berthold Reservation.

Duncan Energy also contends that *New Town* was incorrectly decided, and directs the court's attention to *United States ex rel. Cook v. Parkinson,* 525 F.2d 120 (8th

Cir.1975), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977) and to *Rosebud Sioux Tribe v. Kneip*, 521 F.2d 87 (8th Cir. 1975), *aff'd*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) as support for the proposition that the 1910 Act diminished the Reservation. As a panel of the Eighth Circuit, we have no authority to overrule a previous panel's decision.[2] In any event, we do not find those cases instructive. Both cases cited by Duncan Energy involved different Surplus Land Acts and it is settled law that some Surplus Land Acts diminished reservations while other acts did not. *Solem*, 465 U.S. at 469, 104 S.Ct. at 1165–66; *compare Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) *with Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). To determine whether a reservation has been diminished, we examine three factors: the statutory language, the historical context, and the population that settled the land. *Hagen*, —— U.S. at ——, 114 S.Ct. at 965, (citing *Solem*, 465 U.S. at 470–72, 104 S.Ct. at 1166–67.) Of the three factors, the statutory language is the most probative. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. Throughout the inquiry, ambiguities are to be resolved in favor of the Indians, and diminishment should not be found lightly. *Id.; see also South Dakota v. Bourland*, —— U.S. ——, ——, 113 S.Ct. 2309, 2316, 124 L.Ed.2d 606 (1993).

The language of the 1910 Act does not lend itself to the interpretation urged by Duncan. In cases where courts have found diminishment of a reservation, the Surplus Land Act itself contained phrases unambiguously expressing congressional intent to diminish the reservation. *See, e.g., Hagen*, —— U.S. at —— – ——, 114 S.Ct. at 966–67 ("restore to the public domain"); *Rosebud*, 430 U.S. at 591 n. 8, 97 S.Ct. at 1365 n. 8 ("cede, surrender, grant, and convey to the United States all [the Tribe's] claim, right, title, and interest"); *DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 439 n. 22, 95 S.Ct. 1082, 1090–91 n. 22, 43 L.Ed.2d 300 (1975) ("cede, sell, relinquish, and convey to the United States all [the Tribe's] claim,

right, title and interest"). No similar language appears in the 1910 Act which merely authorized the Secretary of the Interior to "surve[y] and to sell and dispose of . . . all the surplus unallotted and unreserved lands within [a] portion of said reservation. . . ." 36 Stat. at 455.

The 1910 Act further authorized the Secretary to reserve land in the opened territory for schools and religious institutions to be maintained for the benefit of the Tribe. *Id.* at 456. The Act also maintained the prohibition against the introduction of intoxicants into Indian Country in the opened territory, *id.* at 458; reserved all timber rights in the opened territory for the Tribe, *id.;* reserved all coal rights in the opened territory for the Tribe, *id.* at 455; and specifically stated that the United States would act merely as "trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received. . . ." *Id.* at 459. Considering similar statutory language and provisions, the *Solem* Court concluded that a reservation had not been diminished. *Solem*, 465 U.S. at 472–73, 104 S.Ct. at 1167.

We find the contrast between the provisions of the 1910 Act and the language employed in the 1891 Fort Berthold Treaty to be particularly illuminating. In the 1891 Treaty, the Tribe agreed to "cede, sell, and relinquish to the United States all their right, title, and interest in" a portion of the Reservation. 26 Stat. 1032. Thereafter, the Treaty referred to the "diminished Reservation" and provided for surveying to mark the new "outboundaries of the diminished Reservation." *Id.* at 1035. It would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents affecting the Tribe.

The district court acknowledged that it was bound to consider the land in question as part of the Reservation. *Duncan Energy Co. v. The Three Affiliated Tribes*, 812

---

2. We note that this Circuit has recently rejected a similar challenge to *New Town* in the context of a criminal case. *See United States v. Standish*, 3

F.3d 1207 (8th Cir.1993) citing with approval *New Town v. United States*, 454 F.2d 121 (8th Cir.1972).

F.Supp. 1008, 1010–11 (D.N.D.1993). ("Adopting the position that the 1910 and 1914 acts[3] removed this area from the reservation would solve all the issues presented. The ink is hardly dry however on the decision in *United States of America v. Neil D. Standish*, 3 F.3d 1207 (8th Cir.1993), wherein the 8th Circuit disposed of this argument in short order.") Having done so, the court concluded that population and fee ownership patterns in the Northeast Quadrant resulted in a de facto exclusion of that area from most aspects of Tribal jurisdiction. We find this exclusive reliance on the third *Solem* factor to create a quasi-diminishment totally inappropriate.[4]

### B. *Montana* Factors

■ Reaffirming that the Northeast Quadrant remains a part of the Reservation does not end our inquiry in this case. The Supreme Court has determined that the sovereign power of Indian tribes to regulate the activities of non-tribe members on non-Indian fee-lands is limited. *See Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

*Montana* set out the standard for determining whether an Indian tribe's regulatory activities constitute an exercise of its remaining sovereign powers or an unwarranted intrusion into areas outside the tribe's jurisdiction. In *Montana*, the Crow Nation sought to prohibit fishing and hunting by non-Tribe members within the Crow Reservation. The Supreme Court rejected the sovereignty justifications raised by the Crow Nation and ruled that absent an express congressional delegation, the challenged regulation must fail. *Id.* at 565, 101 S.Ct. at 1258. However, the Court did not decide that a tribe never has the authority to regulate the conduct of nonmembers. Instead, the Court noted:

[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe, or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id.* at 565–66, 101 S.Ct. at 1257–78 (citations omitted). It is the second *Montana* exception, protection against a threat to welfare, that the Tribe raises as grounds for its taxing and regulatory actions.

As support for its claim that the Tribe acted impermissibly, Duncan Energy relies heavily on *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989). In *Yakima Nation*, the Supreme Court reviewed the district court's application of the *Montana* exceptions in three cases consolidated for review. A majority of the Court concluded that in two of the cases the zoning ordinance did not rise to the level of a regulation designed to protect against a threat to welfare as described in *Montana*. *Id.* at 432, 109 S.Ct. at 3009. In the third case, a different majority of the Court upheld the Yakima Nation's regulatory authority under the second *Montana* exception. *Id.* at 444, 109 S.Ct. at 3015. In the case before us, the applicability of the *Montana* exceptions is one of the unresolved questions. Due to this difference in the posture of the case, and to the vastly different claims raised as sup-

---

3. The 1914 Act opened the surface of coal lands for homesteading while reserving the underlying mineral rights for the Tribe. 38 Stat. 681.

4. We are not convinced that the district court correctly concluded that the third *Solem* factor weighed in favor of Duncan. While it is true that the land in the Northeast Quadrant is owned almost entirely by non-Tribe members, it is also true that the seat of Tribal government is located

there and that a significant percentage of the Tribe members who live on the Reservation live in the Northeast Quadrant. We also note that the Tribe owns all of the coal beds underneath the Northeast Quadrant. Because we believe that the language of the 1910 Act was not intended to, and did not in fact, diminish the Reservation, we need not further analyze this issue.

port for the regulations, *Yakima* is of limited assistance to our inquiry. We note that Justice Stevens, who joined both majority opinions in *Yakima*, emphasized that the decisions turned on the specific facts of each complaint. *Id.* at 447, 109 S.Ct. at 3016–17.

Since *Yakima* was decided, the Supreme Court has again addressed the issue of tribal authority to regulate activities on non-Tribe member fee lands and has reaffirmed the exceptions to the general rule, articulated in *Montana*, that Indian tribes cannot exercise sovereignty over nonmembers. *See South Dakota v. Bourland,* —— U.S. ——, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). In *Bourland*, the Sioux Nation sought to regulate all hunting and fishing on the Cheyenne River Reservation, including hunting and fishing by non-Tribe members in the Oahe Dam and Reservoir recreation area. The Court concluded that by taking Reservation land for the dam project, and then by opening the reservoir for public use as a recreation area, Congress eliminated the Tribe's regulatory power over the lands. The Court also noted that the Flood Control Act of 1944, expressly transferred regulatory authority over the dam and reservoir to the Army Corps of Engineers.[5] *Id.* —— U.S. at ——, 113 S.Ct. at 2317. Despite these conclusions, the Supreme Court remanded *Bourland* for an analysis of the case in light of the *Montana* exceptions.

Based on our analysis of *Montana* and *Bourland*, we find summary judgment clearly inappropriate in this case. The Northeast Quadrant is part of the Reservation, and the Tribe argues that its regulations are permitted under the second *Montana* exception. We make no judgment as to the merits of the case, but hold that the district court erred by failing to analyze the applicability of the *Montana* exceptions and by finding this exercise of regulatory authority to be impermissible as a matter of law.

**5.** We note that *Bourland* presents a much stronger case for a finding of no Tribal regulatory authority than does this case. The land at issue in *Bourland* had been opened as a public recreation area, and a federal agency had been expressly granted regulatory authority over the land. While rejecting the Tribe's claim that even

### C. Exhaustion of Tribal Remedies

■ Duncan Energy contends that exhaustion of tribal remedies would be both unnecessary and futile. The Tribe, on the other hand, urges us to direct the district court to dismiss this case for failure to exhaust tribal remedies. We agree that exhaustion is necessary as a matter of comity in this case.

■ The Supreme Court has repeatedly recognized the Federal Government's long-standing policy of encouraging tribal self-government. *See, e.g., Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 14, 107 S.Ct. 971, 975–76, 94 L.Ed.2d 10 (1987); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 n. 5, 102 S.Ct. 894, 902 n. 5, 71 L.Ed.2d 21 (1982). Tribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development. *Iowa Mutual,* 480 U.S. at 14–15, 107 S.Ct. at 975–76. Civil jurisdiction over tribal-related activities on reservation land presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or by federal statute. *Id.* at 18, 107 S.Ct. at 977–78. The deference that federal courts afford tribal courts concerning such activities occurring on reservation land is deeply rooted in Supreme Court precedent. Because a federal court's exercise of jurisdiction over matters relating to reservation affairs can impair the authority of tribal courts, the Supreme Court has concluded that, as a matter of comity, the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself. *National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 856, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985).

■ In addition to encouraging tribal self-government, exhaustion of tribal remedies permits:

under these facts its inherent sovereignty enabled it to regulate hunting and fishing, the Supreme Court expressly reserved the question of the Tribe's regulatory authority in other contexts. *Bourland,* —— U.S. at —— n. 9, 113 S.Ct. at 2316 n. 9.

a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed [in the federal district court]. . . . [It will also] encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will provide other courts with the benefit of their expertise in such matters in the event of further judicial review.

*National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2453–54. Thus, the requirement of tribal exhaustion contemplates the development of a factual record that will serve the "orderly administration of justice in the federal court." *Id.* at 856, 105 S.Ct. at 2453.

Once tribal remedies have been exhausted, the Tribal Court's determination of tribal jurisdiction may be reviewed in the federal district court. *See Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978. However,

> unless a federal court determines that the Tribal Court lacked jurisdiction, . . . proper deference to the tribal court system precludes relitigation of issues raised . . . and resolved in the Tribal Court.

*Id.* Therefore, on review, the district court must first examine the Tribal Court's determination of its own jurisdiction. This determination is a question of federal law that must be reviewed *de novo. See FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1313 (9th Cir.1990). However, in making its analysis, the district court should review the Tribal Court's findings of fact under a deferential, clearly erroneous standard. *Id.* The Tribal Court's determinations of federal law should be reviewed *de novo* while determinations of Tribal law should be accorded more deference. *Id.*

Duncan Energy contends that *National Farmers Union* and *Iowa Mutual* are inapplicable to cases involving fee lands. We find such a limited reading of those cases to be inappropriate; nothing in the broad language employed by the Supreme Court indicates that the reasoning in *Iowa Mutual* and *National Farmers Union* applies only to similar factual situations. This court has previously interpreted *National Farmers Union* and *Iowa Mutual* to require exhaustion of tribal

court remedies before a case may be considered by a federal district court. *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554 (8th Cir.1993); *see also United States ex rel. Kishell v. Turtle Mountain Housing Auth.,* 816 F.2d 1273, 1276 (8th Cir.1987) ("a federal court should stay its hand until tribal remedies are exhausted and the tribal court has had a full opportunity to determine its own jurisdiction"); *Weeks Constr., Inc. v. Oglala Sioux Housing Auth.,* 797 F.2d 668, 674 (8th Cir.1986).

Other circuits considering this issue have reached a similar conclusion. *See, e.g., Smith v. Moffett,* 947 F.2d 442, 445 (10th Cir.1991) (relying on *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 1673–74, 95 L.Ed.2d 119 (1987) for the proposition that *Iowa Mutual* and *National Farmers* established "an inflexible bar to consider[ing] the merits of [a] petition by the federal court, and therefore requir[ing] that a petition be dismissed when it appears that there has been a failure to exhaust [tribal remedies]"); *Crawford v. Genuine Parts, Co.,* 947 F.2d 1405, 1407 (9th Cir.1991) ("The requirement of exhaustion of tribal remedies is not discretionary; it is mandatory. If deference is called for, the district court may not relieve the parties from exhausting tribal remedies."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992). We find this dispute over tribal taxation and employment rights to be a dispute arising on the Reservation that raises questions of tribal law and jurisdiction that should first be presented to the tribal court. *See Weeks Constr.,* 797 F.2d at 673; *Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 815 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993).

Duncan Energy also contends that any recourse to Tribal remedies would be futile because the Tribal Court will be biased in favor of upholding the taxes. The Supreme Court excepts from the general comity requirement situations where:

> an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile

because of the lack of an adequate opportunity to challenge the court's jurisdiction. *National Farmers Union,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2453–54 n. 21. We note that Duncan Energy does not present any evidence of bias, but merely assumes that it could not receive a fair trial in the Tribal Court. The Supreme Court has declined to permit parties to excuse themselves from the exhaustion requirement by *merely alleging* that tribal courts will be incompetent or biased. *See Iowa Mutual,* 480 U.S. at 18–19, 107 S.Ct. at 977–78 ("[t]he alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement established in *National Farmers Union*"); *see also Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65–66 n. 21, 98 S.Ct. 1670, 1680–81 n. 21, 56 L.Ed.2d 106 (1978). Absent any indication of bias, we will not presume the Tribal Court to be anything other than competent and impartial.

Finally, we note that the Tribe may have a heavy burden justifying these tax and employment statutes under the *Montana* exceptions, but that caveat does not alter our conclusion that this issue [6] is for the Tribal Court to determine in the first instance.

## III. CONCLUSION

For the reasons stated above, the decision of the district court is reversed and the case is remanded to the district court. The district court should either dismiss this case without prejudice for failure to exhaust tribal remedies, or should stay any proceedings until those remedies are exhausted.

LOKEN, Circuit Judge, concurring.

I agree with the court that we are bound to follow *New Town* and that the district court erred in granting summary judgment on the *Montana* exception issues. I am more troubled than the court by the difficult exhaustion issue. On balance, I conclude that *National Farmers Union Ins. Co. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), is controlling and requires that we remand with instructions to stay this case until the parties have had a reasonable opportunity to present the *Montana* exception issues to the tribal court.

The *Montana* exceptions are standards for determining the extent of tribal power. Although most courts have looked at *National Farmers Union* as involving only tribal court jurisdiction, in fact the Supreme Court's focus was broader:

This Court has frequently been required to decide questions concerning the extent to which Indian tribes have retained the power to regulate the affairs of non-Indians. [Citing *Montana*] . . . In this case the petitioners contend that the Tribal Court has no power to enter a judgment against them. . . . [P]etitioners, in essence, contend that the Tribe has to some extent been divested of this aspect of sovereignty. . . . The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a "federal question" under § 1331. . . . The District Court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.

471 U.S. at 851–53, 105 S.Ct. at 2451–52. Even though federal law governed and conferred federal court jurisdiction, the Supreme Court required the parties in *National Farmers Union* to exhaust pending tribal court jurisdiction because of the "policy of supporting tribal self-government," the benefit to the federal court in "allowing a full record to be developed in the Tribal Court," and the advantages of "encourag[ing] tribal courts to explain to the parties the precise basis for accepting jurisdiction." 471 U.S. at 856–57, 105 S.Ct. at 2454. These reasons to require exhaustion seem perfectly applicable to this case. The shoe fits, so we should wear it? Unfortunately, there are three problems that make this a far-from-obvious solution.

---

**6.** At a minimum, we would be obliged to remand this case to the district court for an examination of the *Montana* exceptions. However, we are convinced that the better course is to defer to the Tribal Court.

First is the fact that every case raising *Montana* exception issues came to the Supreme Court from lower federal courts, yet the Court never even considered exhaustion of tribal court remedies in cases like *South Dakota v. Bourland*, —— U.S. ——, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), and *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), which were decided well after *National Farmers Union*. Perhaps the Supreme Court did not consider this question because no party raised it. On the other hand, perhaps the Court did consider *and reject* exhaustion for cases raising *Montana* exception issues, rather than tribal court jurisdiction issues. Though the question is hardly free from doubt, I think the first answer must be correct, particularly because the Court cited *Montana* in developing its exhaustion principles in *National Farmers Union*. Thus, I conclude that *National Farmers Union* exhaustion may properly be required in *Montana* exception cases.

Second is a problem that concerned the district court—if *Montana* exception issues require tribal court exhaustion, will the tribal court's answer be the last word? This question requires analysis of an often ignored but highly significant passage in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987):

> Although petitioner must exhaust available tribal remedies.... [if] the Tribal Appeals Court [rules] that the tribal courts have jurisdiction, petitioner may challenge that ruling in the District Court. See *National Farmers Union, supra*, [471 U.S.] at 853, [105 S.Ct. at 2452]. Unless a federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised ... and resolved in the Tribal Courts.

As the district court recognized, tribal court jurisdiction is not at issue here—the tribal court of course has jurisdiction to enforce a tribal tax or employment law. The federal question here goes to the merits of the case—whether the Tribe has the sovereign power to enact the tax and employment laws being enforced. If the preclusion referred to

in *Iowa Mutual* is that which normally applies between federal and state courts, for example, the tribal court's decision on this question of federal law will be binding on the parties. See *Allen v. McCurry*, 449 U.S. 90, 103–04, 101 S.Ct. 411, 419–20, 66 L.Ed.2d 308 (1980); *Montana v. United States*, 440 U.S. 147, 156, 99 S.Ct. 970, 975, 59 L.Ed.2d 210 (1979). In that event, by requiring exhaustion, we will have surrendered authority to decide these critical *Montana* exception issues, a result at odds with the many Supreme Court decisions reserving these issues for the federal courts.

I believe that the key to unraveling this enigmatic passage in *Iowa Mutual* is to recall both the breadth of the discussion in *National Farmers Union*, which encompassed issues of tribal sovereignty as well as tribal court jurisdiction, and the nature of the merits of the case before the Court in *Iowa Mutual*, a diversity dispute over insurance coverage. With that in mind, I agree with the court that tribal court decisions concerning federal questions of tribal sovereignty may be challenged in the federal courts.

But I do not agree that, in deciding such challenges, we conduct some sort of direct review of the tribal court, considering issues of law de novo and findings of fact under the clearly erroneous standard. "Federal courts.... possess only that power authorized by Constitution and statute," *Kokkonen v. Guardian Life Ins. Co.*, —— U.S. ——, ——, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994), and I know of no statute giving the district and circuit courts jurisdiction to review tribal court decisions. See 28 U.S.C. §§ 1330–67 (district court jurisdiction), *and* §§ 1291–92 (court of appeals jurisdiction). The Supreme Court has ruled that we have federal question jurisdiction to decide *Montana* exception issues. The district court will ultimately decide those issues, with whatever guidance the tribal court may now provide. In my view, it is premature to determine what evidentiary or legal weight to ultimately give the tribal court's decision.

The third problem, and the most serious in my view, is that here there is no case pending in the tribal court, as there was in both *National Farmers Union* and *Iowa Mutual*. Requiring "exhaustion" in a forum not chosen by any party looks like a subversion of

"the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Moreover, we do not know what form the dispute may take in tribal court, or whether the tribal court will even agree to review *Montana* exception issues that the federal court retains ultimate authority to decide.

On the other hand, the reasons for exhaustion cited in *National Farmers Union*—the policy of supporting tribal self-government, the advantages of allowing a full record to be developed in tribal court, and the benefit of receiving the tribal court's expertise on these issues of tribal sovereignty—apply whether or not the dispute is already pending in the tribal court. In these circumstances, I agree with the court that exhaustion is appropriate, but I also conclude that it would be an unwarranted abdication of the district court's jurisdiction to dismiss the case at this time. In my view, that court should grant a stay for a reasonable period to permit one or more of the parties to submit these disputes to the tribal court and to permit the tribal court to accept jurisdiction and rule. Following that, the district court should again take up the *Montana* exception issues, exercising its discretion to give the tribal court's decision (if there is one) such deference as may be warranted.